Ellen Relkin, Esq. (314992)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
(212) 558-5715
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JASON GLUCH**<br>183 Valley Drive<br>Churchville, PA 18966<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>**JUUL LABS, INC.**<br>**560 20th Street**<br>**San Francisco, CA 94107**<br><br>**PAX LABS, INC.**<br>**660 Alabama Street**<br>**San Francisco, CA 94110**<br><br>**ALTRIA GROUP, INC.**<br>**6601 W Broad St, Richmond, VA 23230**<br><br>**PHILLIP MORRIS, USA, INC.**<br>**6601 W Broad St, Richmond, VA 23230**<br><br><br>**and**<br>**DOES 1-10,**<br><br>　　　　　Defendants. | Civil Action No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. **Design Defect - Consumer Expectations Test**<br>2. **Design Defect - Risk-Utility Test**<br>3. **Strict Products Liability - Failure To Warn**<br>4. **Negligence And/Or Gross Negligence**<br>5. **Negligent Failure To Recall**<br>6. **Fraudulent Concealment**<br>7. **Conspiracy To Commit Fraudulent Concealment**<br>8. **Intentional Misrepresentation**<br>9. **Intentional Infliction of Emotional Distress**<br>10. **Violation Of Pennsylvania Unfair Trade Practices And Consumer Protection Law** |

Plaintiff, Jason GLUCH, by and through his undersigned counsel, brings this complaint

against Defendants JUUL Labs, Inc., Altria Group, Inc., Pax Labs, Inc., and Phillip Morris USA, Inc., and Does 1-10 and alleges as follows:

## I.    INTRODUCTION

1.    JASON GLUCH was hospitalized for six days from July 26 through July 31, 2019 for life threatening respiratory failure, Bronchiolitis Obliterans Organizing Pneumonia (BOOP) and associated injuries including severe sepsis as a result of his use from January of 2019 through July 2019 of Mango flavored JUUL pods.   This was a result of Defendants' orchestrated efforts to addict and exacerbate prior nicotine addition to a new generation of youths. Defendants' wrongful conduct in marketing, promoting, manufacturing, designing, and selling JUUL substantially contributed to JASON GLUCH's injuries.

2.    In 2015, JUUL set out to recapture the magic of the most successful product ever made—the cigarette.  Due to regulations and court orders preventing the major cigarette manufacturers from marketing to young people, youth smoking had decreased to its lowest levels in decades.  While the public health community celebrated this decline as a victory, JUUL saw an opportunity.  Seizing on regulatory inaction and loopholes for e-cigarettes, JUUL set out to develop and market a highly addictive product that could be packaged and sold to young people. Youth is and has always been the most sought-after market for cigarette companies, because they are the most vulnerable to nicotine addiction and are most likely to become customers for life.

3.    JUUL was designed perfectly for teenagers and young adults.  It doesn't look or smell like a cigarette.  It is a sleek, high-tech youth-friendly battery-powered device that looks like a USB drive.  The JUUL device heats a nicotine-filled liquid JUULpod, sold separately in fun flavors like mango and cool mint, delivering powerfully potent doses of nicotine, along with aerosol and other toxic chemicals into the lungs, body and brain.  Unlike noxious cigarette smoke, when a JUUL user exhales, the smoke is undetectable. JUUL is small, easily concealable and can be used practically anywhere without parents or teachers knowing; Googling "hiding JUUL in school" or "how to ghost rip JUUL" returns hundreds of videos on how to JUUL

anywhere without detection.  This is part of the appeal, fostered and bolstered by JUUL's viral marketing campaigns using young models to make the products look cool and stylish.

4.     Defendants designed JUUL to addict young people.  Nicotine is one of the most addictive chemicals in the world.  By studying cigarette industry archives, JUUL learned how to manipulate the nicotine in its products to maximize addictiveness.  JUUL designed its products to have maximum inhalability, without any "throat hit" or irritation that would serve as a natural deterrent to new users. JUUL designed its device to deliver substantially higher concentrations of nicotine per puff than traditional cigarettes and most other e-cigarettes.  This combination of ease of inhalation and high nicotine delivery makes JUUL both powerfully addictive and dangerous.

5.     Nicotine is dangerous, particularly to young people whose brains are still developing.  Nicotine is not only addictive, but also permanently alters the structure of the brain and causes permanent mood changes and other cognitive disorders.

6.     Nicotine addiction causes repeated exposure to the toxins and aerosols contained in JUUL's vapor.

7.     Several studies, including one recently released by the American Stroke Association, have shown that e-cigarettes increase the risk of stroke, heart attack and coronary artery disease.[1]

8.     Other studies have shown that e-cigarettes containing nicotine significantly increase blood pressure, heart rate and arterial stiffness, and also cause vascular damage, which can lead to strokes and other cardiovascular injuries.

9.     These studies build on the well-established research that nicotine increases blood pressure.

10.    Even though e-cigarettes are unsafe, JUUL heavily promoted its products to young people.  Following the wildly successful playbook laid out in historic cigarette industry

---

[1] *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries* (Jan. 30, 2019) American Stroke Association *News Release,* Abstract 9, Session A2, *https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries* (as of July 5, 2019).

documents, Defendant leveraged social media and utilized other marketing and promotion tactics, long outlawed for cigarette companies, to capture the highly-lucrative youth market. JUUL preyed on youth using media and themes that exploit young persons' vulnerabilities to create and sustain nicotine addiction, all for financial gain, and without giving warnings about the serious risks of addiction, cardiovascular and brain injuries, and other permanent injuries.

11.     At the time Plaintiff used JUUL, none of JUUL's advertising, marketing, promotion, packaging or website disclosed the health effects and risks that JUUL knew or should have known would occur from use of its products. These risks include nicotine addiction, lung injury including Bronchiolitis Obliterans Organizing Pneumonia (BOOP), significant increases in blood pressure, vascular damage, increased risk of stroke, heart attacks and other cardiovascular injuries, permanent brain changes, mood disorders, heightened risk of cancer, and other harms. Instead, the imaging, advertising, promotion, packaging and overall marketing represented the product as safe, fun, and not harmful and a safe r alternative to cigarettes. As one of the JUUL founders has said: "We don't think a lot about addiction here because we're not trying to design a cessation product at all…anything about health is not on our mind".[2]

12.     Since 2015 when JUUL hit the market, JUUL has become pervasive in schools across the country and adolescent and young adult use is rampant. JUUL not only dominates the multi-billion dollar e-cigarette market, but has expanded the size of that market significantly— mostly via young non-smokers. The cigarette company Defendant Altria (formerly known as Philip Morris) acquired a 35% stake in JUUL for $12.8 billion, giving Defendant Altria access to the new generation of customers JUUL has groomed and capturing its former cigarette smokers who were leaving the conventional cigarette market for the promise of e-cigarettes being a safer alternative.

---

[2] Tiku, *Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette: Surprise, it's a rectangle*, The Verge (April 21, 2015) *www.theverge.com/ 2015/4/21/8458629/pax-labs-e-cigarette-juul* (as of July 5, 2019).

13.     JUUL has created an epidemic.  According to Alex Azar, the Secretary of the U.S. Department of Health and Human Services, "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."[3]  JUUL's conduct has led to a surge in teen e-cigarette use, creating the "largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance use outcome in the U.S."[4]  In a mere two years, Defendant undid more than a decade of progress in reducing teen smoking, thereby increasing nicotine use among teenagers to levels not seen since the early 2000s.  Plaintiff was a target and a victim of JUUL's conduct.

14.     As a result of Defendants' conduct, Plaintiff  suffered life-altering personal injuries including the serious lung injury  Bronchiolitis obliterans organizing pneumonia (BOOP), also called Cryptogenic Organizing Pneumonia (COP),  which according to the American Lung Association is a rare lung condition affecting the small airways (bronchioles), alveoli (tiny air sacs) and the walls of small bronchi. This pattern of lung damage involving inflammation and stiffening of affected lung areas with connective tissue. [5] Accordingly, Plaintiff seeks all appropriate remedies and relief.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interests and costs, and because Defendants are all incorporated and have their principal places of business in states other than the state in which the named Plaintiff resides.  JUUL, Altria, Pax Labs. Inc, Phillip

---

[3] *Surgeon General releases advisory on E-cigarette epidemic among youth*, U.S. Department of Health & Human Services (Dec 18, 2018) *www.hhs.gov/about/news/2018/12/18/surgeon-general-releases-advisory-e-cigarette-epidemic-among-youth.html* (as of July 5, 2019).

[4] Boyles, *Surgeon General Calls for New E-Cig Restrictions: 'I am officially declaring e-cigarette use among youth an epidemic* (Dec 28, 2018) *www.medpagetoday.com/primarycare/smoking/77000* (as of July 5, 2019).

[5] https://www.lung.org/lung-health-and-diseases/lung-disease-lookup/boop/#targetText=Bronchiolitis%20obliterans%20with%20organizing%20pneumonia%20(BOOP)%2C%20also%20called%20Cryptogenic,the%20walls%20of%20small%20bronchi.&targetText=Sometimes%2C%20a%20cause%20cannot%20be,this%20form%20of%20lung%20injury.

Morris USA, Inc. and Does 1-10 purposely availed themselves of the benefits, protections and privileges of the laws of the State of Pennsylvania in conducting their business, by advertising, marketing and selling JUUL products there to the Plaintiff and have purposely directed their activities in this State and have sufficient minimum contacts with this State to render the exercise of jurisdiction by this Court permissible.

16.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in the Eastern District of Pennsylvania.

III.   **THE PLAINTIFF**

17.   Plaintiff, JASON GLUCH is 28 years old and a resident of Bucks County, Pennsylvania.

18.   Beginning in 2019, when he was  27 years of age JASON GLUCH was exposed to JUUL's advertising and promotional efforts via many sources, including Snapchat, Instagram, and on his YouTube account.

19.   JASON GLUCH initially began using JUUL as a method to quit cigarettes. Shortly after starting JUUL he was smoking at least one JUUL pod a day, which has far more nicotine than his former average half-pack a day cigarette habit.

20.   JASON GLUCH continued to use JUUL as he believed based on Defendants' misrepresentations that JUUL is safer than cigarettes.  While believing JUUL to be safer than cigarettes, JASON GLUCH, was also attracted to JUUL's fruity flavors, specifically Mango, which he preferred for the duration of his JUUL use.

21.   JASON GLUCH has regularly consumed JUUL products, including JUUL devices and JUULpods, from January 2019 until being diagnosed with Bronchiolitis Obliterans Organizing Pneumonia ("BOOP") on July 26, 2019.

22.   JASON GLUCH was unaware when he first started using JUUL that it could cause respiratory failure, permanent lung damage including  Bronchiolitis Obliterans Organizing Pneumonia, Cryptogenic Pneumonia,  mood disorders such as anxiety and depression,  an

inability to concentrate, decreased breathing capacity, strokes, and other cardiovascular injuries. Had he known these things, he would not have started using JUUL.

23.     Within just a few months of trying JUUL several times, JASON GLUCH was so addicted to JUUL that he was using a JUUL pod every day. JASON GLUCH became powerfully addicted to JUUL, smoking a pack of JUUL pods a week, taking puffs as often as possible throughout each day and even waking up in the middle of the night to do so.

24.     JASON GLUCH began to experience chills and night sweats for two weeks before his symptoms began to include blurry vision, dizziness, and lightheadedness at which point he sought medical care.

25.     Medical professionals were shocked by JASON GLUCH's low blood oxygen and was immediately transferred to the hospital. At the hospital he was in respiratory failure and was told that he may have to be on a breathing machine for the rest of his life and after several days of hospitalization was diagnosed with BOOP.

26.     JUUL was a substantial factor in Plaintiff JASON GLUCH's injuries.

## IV.     THE DEFENDANTS

### A.     JUUL Labs, Inc.

27.     Defendant JUUL Labs, Inc. ("JUUL") is a Delaware corporation, having its principal place of business in San Francisco, California.

28.     JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JUUL originally was authorized to do business under the name Ploom Products, Inc. It changed its name to PAX Labs, Inc., and subsequently to JUUL Labs, Inc. All allegations toward JUUL are inclusive of JUUL in its prior form as either Ploom Products, Inc. or PAX Labs, Inc., or both. Accordingly, JUUL is a citizen of Delaware and California for purposes of determining diversity under 28 U.S.C. § 1332.

29.     JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes.

30.    JUUL ratified each and every act or omission alleged herein in proximately causing the injuries and damages alleged herein.

**B.    Altria Group, Inc.**

31.    Defendant Altria Group, Inc. ("Altria") is incorporated in Virginia and has its principal place of business in Richmond, Virginia.

32.    Altria has partnered with JUUL Labs, Inc. In 2018, Altria acquired 35% ownership in JUUL for $12.8 billion and access to Altria's industry infrastructure.

**C.    PAX Labs, Inc.**

33.    Defendant PAX Labs, Inc. ("PAX") is a Delaware corporation with its principal place of business in San Francisco, California. Accordingly, PAX is a citizen of Delaware and California for purposes of determining diversity under 28 U.S.C. § 1332.

**D.    Phillip Morris USA, Inc.**

34.    Defendant Philip Morris USA, Inc. ("Philip Morris") is a Virginia corporation with its principal place of business in Richmond, Virginia. Philip Morris is a wholly-owned subsidiary of Altria. Philip Morris is engaged in the manufacture and sale of cigarettes in the United States. Philip Morris is the largest cigarette company in the United States with Marlboro, the principal cigarette brand of Philip Morris, being the largest-selling cigarette brand in the United States for forty years. Accordingly, Philip Morris is a citizen of Virginia for purposes of determining diversity under 28 U.S.C. § 1332. Altria and Philip Morris may be referred to collectively as the "Altria Defendants."

**E.    Does 1-3**

35.    Upon information and belief, Defendants Does 1 through 3 are individuals and corporations who directed their activities toward the state of Pennsylvania and/or have minimum contacts in this State.

36.    Upon information and belief, Defendants Does 1 through 3 provided scientific research and development services to Defendant JUUL, enabling and in furtherance of JUUL's manufacturing, design, sale, marketing, promotion, and distribution of JUUL e-cigarettes.

**F.**   **Does 4-6**

37.     Upon information and belief, Defendants Does 4 through 6 are individuals and corporations who directed their activities toward the state of Pennsylvania and/or have minimum contacts in this State.

38.     Upon information and belief, Defendants Does 4 through 6 provided marketing services, including, but not limited to, market analyses, advertising consultations, advertisement design, marketing tools and techniques, marketing strategies, data on potential target consumer populations, and other services enabling and in furtherance of JUUL's manufacturing, design, sale, marketing, promotion, and distribution of JUUL e-cigarettes.

**G.**   **Does 7-10**

39.     Upon information and belief, Defendants Does 7 through 10 are individuals and corporations who directed their activities toward the state of Pennsylvania and/or have minimum contacts in this State.

40.     Upon information and belief, Defendants Does 7 through 10 are members of the e-cigarette industry that conspired with JUUL to fraudulently conceal and downplay the risks of e-cigarettes, engage in a campaign of doubt and confusion, and overstate the benefits of e-cigarettes and nicotine.

**V.**   **FACTUAL ALLEGATIONS**

**A.**   **JUUL Seeks to Re-create the "Magic" of the Cigarette, the "Most Successful Consumer Product of All Time", using the Cigarette Industry's Playbook.**

41.     JUUL's founder James Monsees has described the cigarette as "the most successful consumer product of all time . . . . an amazing product."[6] Because of "some problems" inherent in the cigarette, JUUL's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[7]

---

[6] Chaykowski, *Billionaires-to-be: Cigarette breakers - James Monsees and Adam Bowen have cornered the US e-cigarette market with Juul. Up next: The world*, FORBES Magazine (Sep 27, 2018), *www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1* (as of July 5, 2019).

[7] Mings, *Ploom model Two Slays Smoking with Slick Design and Heated Tobacco Pods*, Solid

42.     Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[8] With a focus on recreating the "ritual and elegance that smoking once exemplified,"[9] Monsees and Adam Bowen set out to "meet the needs of people who want to enjoy tobacco but don't self-identify with — or don't necessarily want to be associated with — cigarettes."[10]

43.     JUUL used the cigarette industry's prior practices as a playbook.  Monsees has publicly admitted that JUUL built its e-cigarette business by first consulting cigarette industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the cigarette industry, governmental officials, and injured smokers. "[Industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch right up to a huge, huge industry in no time. And then we started building prototypes."[11]

44.     JUUL researched how cigarette companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[12] Among the documents JUUL would have found were those documenting how to manipulate nicotine pH to maximize the delivery of nicotine in a youth-friendly vapor that delivers minimal "throat hit"—a combination that creates unprecedented risks of nicotine abuse and addiction, as detailed further below.

---

Smack (Apr 23, 2014), *www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods/* (as of July 5, 2019).

[8] *Id.*

[9] *James Monsees – Co-founder and CEO of Ploom*, IDEAMENSCH (Apr 11, 2014), *https://ideamensch.com/james-monsees/* (as of July 5, 2019).

[10] *Id.*

[11] Montoya, *Pax Labs: Origins With James Monsees*, Social Underground, *https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/* (as of July 5, 2019).

[12] *Id.*

45.     JUUL also engaged former cigarette industry researchers to consult on the design of their product.  JUUL's founder James Monsees noted in Wired magazine that "people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore.  If you go to Altria's R&D facility, it's empty."  The Wired article stated that "some of those people are now on Pax's team of advisers, helping develop JUUL."[13]

46.     JUUL also used cigarette industry advertisements—which were created to lure nonsmoking youth—as a blueprint for JUUL's advertising campaigns. In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them."[14]

47.     JUUL achieved its vision. Since its launch in 2015, JUUL has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017. According to a recent Wells-Fargo report, JUUL owns three-quarters of the e-cigarette market.[15]

A.     **JUUL is a Sleek, Easy to Conceal Nicotine Delivery Device with Kid-Friendly Flavors.**

48.     The JUUL e-cigarette looks sleek and high-tech.  JUUL looks like a USB flash drive, and it actually charges in a computer's USB drive. It is about the size and shape of a pack of chewing gum; it is small enough to fit in a closed hand. JUUL is easy to conceal from parents and teachers. The odor emitted from JUUL is a reduced aerosol without much scent – unlike the distinct smell of conventional cigarettes.

---

[13] Pierce, *This Might Just Be The First Great E-Cig*, *WIRED*, (Apr 21, 2015), *www.wired.com/2015/04/pax-juul-ecig/* (as of July 5, 2019).

[14] Jackler *et al.*, *JUUL Advertising Over its First Three Years on the Market, Stanford Research into the Impact of Tobacco Advertising*, Stanford University School of Medicine (Jan 31, 2019), *http://tobacco.stanford.edu/tobacco_main/ publications/JUUL_Marketing_Stanford.pdf* (as of July 5, 2019).

[15] Durbin *et al.*, *Letter from United States Senators to Kevin Burns CEO JUUL Labs Inc. (Apr 8, 2019), www.durbin.senate.gov/imo/media/doc/ FINAL%20JUUL%20Letter%204.8.19.pdf* (as of July 5, 2019).

49.     The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

 

50.     JUUL manufactures and distributes its nicotine formulation as JUULpods, which contain JUUL's nicotine liquid. JUUL exclusively sells its pods in four-packs, in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. According to a recent survey of more than 1,000 12 to 17-year-olds, 6.5% admitted to using a JUUL e-cigarette. Of those, 86% of users most recently used fruit medley, mango, cool mint, or crème brulee.[16]  Plaintiff who started using Juul at the young adult age of 27 chose the Mango flavor.

---

[16] Willett, *JUUL: Recognition, use and perceptions* (Apr 26, 2018), *www.publichealthlawcenter.org/sites/default/files/JUUL-Webinar-Slides-Apr262018.pdf* (as of July 5, 2019).

  

51.     The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, Defendant can finely tune the amount of nicotine vapor the JUUL delivers.[17]

### B.    **JUUL Designed its E-Cigarettes to Make them Easy for Young People to Inhale and to Deliver Substantially Higher Doses of Nicotine than Cigarettes.**

52.     According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[18] The cigarette industry has long known that "nicotine is the addicting agent in cigarettes"[19] and that "nicotine satisfaction is the dominant desire" of nicotine addicts.[20]

53.     For this reason, cigarette companies spent decades manipulating nicotine in order to foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled

---

[17]  Talih *et al.*, Characteristics and toxicant emissions of JUUL electronic cigarette (Feb 11, 2019) Tob Control. 054616 *www.ncbi.nlm.nih.gov/pubmed/30745326/* (as of July 5, 2019).

[18] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General, Chapter 4, Nicotine Addiction: Past and Present (2010), *www.ncbi.nlm.nih.gov/books/NBK53017/* (as of July 5th, 2019).

[19] Brown & Williamson official A.J. Mellman, (1983) Tobacco Industry Quotes on Nicotine Addiction, *www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes %20on%20Nicotine%20Addiction.pdf* (as of July 5, 2019).

[20] *Id.*, R.J. Reynolds Tobacco Co. marketing memo, 1972.

"Cigarette concept to assure RJR a larger segment of the youth market," manipulating the pH of nicotine was expected to give cigarettes an "additional nicotine 'kick'."[21] This kick was attributed to increased nicotine absorption associated with lower pH.[22]

54.    JUUL knowingly used the RJR research and conclusions to produce a similar nicotine kick, and thereby promoting increased use and sales of JUUL e-cigarettes. In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier.

55.    In a 2015 interview, Ari Atkins, a JUUL research & development engineer and one of the inventors of the JUUL device said this about the role of acids: "In the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it ..." He pauses. "I've got to choose the words carefully here: Appropriate for inhalation."[23]

56.    JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form. This reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not be absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat. A recent study found that

---

[21] *Id.*, 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market."

[22] Benowitz *et al.*, Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology (Oct. 13, 2010), Handb Exp Pharmacol 192:29–60, *www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/* (as of July 5, 2019).

[23] Pierce, *This Might Just Be The First Great E-Cig* (Apr 21, 2015) WIRED, *www.wired.com/2015/04/pax-juul-ecig/* (as of July 5, 2019).

JUUL's e-liquid had a pH of under 6.0, suggesting that the JUUL contains almost no freebase (i.e., non-salt form) nicotine.[24]

57.     The vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine—and hence causes the same amount of irritation—as a nearly nicotine-free 3 mg/mL e-liquid.[25]

58.     The same chart further shows that the Duell Study authors found that the low freebase fraction in its aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." *Id.* At 431-434.

59.     The authors noted that "tobacco company documents suggest that products [like JUUL] with high nicotine levels but a low [percentage of freebase nicotine] will yield vape aerosols of much reduced harshness as compared to products with even only moderate nicotine levels" but high percentages of freebase nicotine. *Id.*

60.     JUUL's creation of a product with low levels of harshness and minimal throat "hit" is consistent with the goal of producing a product for young non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation. The design also shows that JUUL's intention was to recruit nonsmokers, not existing smokers, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix. Minimizing the throat "hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers, but is crucial to luring a new generation of users.

---

[24] Lauterbach, One More Time Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There? (2018) *www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf* (as of July 5, 2019); Other studies have confirmed the low ratio of freebase nicotine in JUUL products. *See* Duell *et al.*, Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy (Jun 18, 2018) 31 Chem. Res. Toxicol. 431-434, *www.ncbi.nlm.nih.gov/pmc/articles/PMC6008736/* (as of July 5th, 2019).
[25] *Id.*, Duell Study, Fig. 3.

61.     The Duell study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[26]

62.     JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he is inhaling something harmful. Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation. Reducing or removing this feedback impairs the user's ability to ascertain that he is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction, and repeatedly exposing the user to the health risks associated with the product, such as significantly increased blood pressure.

63.     JUUL sells products that contain relatively low amounts of throat-irritating freebase nicotine, yet contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems ("ENDS") containing freebase nicotine.

64.     Blood plasma studies in the '895 patent[27] show that vaping nicotine benzoate increases nicotine delivery compared to cigarettes or vaporized solutions of freebase nicotine. In fact, nicotine uptake was up to four times higher for nicotine salt formulations than traditional cigarettes (approximately 4 ng/mL/min compared to approximately 1 ng/mL/min). JUUL's data also indicates that nicotine salt solutions produce a higher heart rate in a shorter amount of time (a 50 beats/minute increase within 2 minutes for nicotine salt, versus a 40 beats/minute increase in 2.5 minutes for a Pall Mall cigarette).  Nicotine salts also cause a faster and more significant rise in heart rate than placebo or vaporized freebase nicotine.

---

[26] *Id.*, Duell Study (citing Willett, *et al.*, Recognition, use and perceptions of JUUL among youth and young adults, Tobacco, Tob Control. 2019 Jan;28(1):115-116.)
[27] *See* U.S. Patent No. 9, 215, 895.

65.     JUUL's '895 patent shows that a 4% solution of benzoic acid nicotine salt causes a peak nicotine-blood concentration ("Cmax") of approximately 15 ng/mL, compared to a Cmax of 11 ng/mL for a Pall Mall cigarette.[28]

66.     As high as the reported nicotine dose reported for JUULpods is, the actual dose is likely higher. Though the strongest benzoic acid concentration mentioned in the '895 patent is 4% (i.e., 40 mg/mL of benzoic acid), one study tested four flavors of JUULpods and found a 4.5% benzoic acid (44.8 ± 0.6) solution.[29] That study found that JUULpods contained a concentration of 6.2% nicotine salt (about 60 mg/mL), rather than the 5% nicotine (about 50 mg/mL) advertised. JUULpods containing an absolute nicotine concentration 1.2% higher than the stated 5% on the label (a relative increase of over 20%) coupled with more benzoic acid than listed in the '895 patent produce higher nicotine absorption than expected for the advertised formulation.

67.     Other studies have reported even higher actual concentrations of nicotine in JUULpods.  Some experts estimate that JUULpods deliver the same nicotine as two packs of cigarettes.[30]

68.     In any event, JUUL is delivering doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[31] With at least 59 mg/mL of nicotine delivered in a salt form that increases the

---

[28] '895 Patent, at col. 26, ll. 33-50.
[29] Pankow *et al.*, Benzene formation in electronic cigarettes (Mar 8, 2017) PLoS One. 2017; 12(3): e0173055 *www.ncbi.nlm.nih.gov/pmc/articles/PMC5342216/* (as of July 5, 2019).
[30] *6 important facts about JUUL*, Truth Initiative, *https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul* (as of July 5, 2019)
[31] "E-Cigarettes"
*https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf* (as of July 5, 2019) (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

rate and efficiency of uptake (and even with a lower mg/mL amount), a JUULpod will easily exceed the nicotine dose of a traditional cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and Israel is seeking to do the same. [32] As Israel's Deputy Health Minister has noted, "a product that contains a concentration of nicotine that is almost three times the level permitted in the European Union constitutes a danger to public health and justifies immediate and authoritative steps to prevent it from entering the Israeli market."[33]

69.     Comparison of available data regarding per puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes."[34] The Reilly study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152—193 μg/puff.[35] Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 μg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

---

[32] Belluz, *Juul, the Vape Device Teens are Getting Hooked On, Explained* (Dec 20, 2018) Vox *https://www.vox.com/science-and-health/2018/5/1/17286638/juul-vaping-e-cigarette* (as of July 5, 2019).

[33] Linder-Ganz, *JUUL Warns It Will Fight Israel Over Its Potential Ban on E-Cigarettes* (Jan 30, 2018), HAARETZ, *www.haaretz.com/israel-news/business/juul-warns-it-will-fight-israel-over-potential-ban-on-its-e-cigarettes-1.6140058* (as of July 5, 2019).

[34] Reilly *et al.*, Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes (Oct 20, 2018) Nicotine Tob Res. 3 (the "Reilly study") *https://www.ncbi.nlm.nih.gov/pubmed/30346584* (as of July 5, 2019).

[35] Schroeder &  Hoffman, Electronic Cigarettes and Nicotine Clinical Pharmacology (May 2014) Tobacco Control 2014: 23:ii30-ii35, *www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/* (as of July 5, 2019).

70.     Because "nicotine yield is strongly correlated with tobacco consumption,"[36] a JUULpod with more nicotine will strongly correlate with higher rates of consumption of JUULpods, generating more revenue for JUUL.  For example, a historic cigarette industry study looking at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[37] In other words, the more nicotine in the cigarettes, the more cigarettes a person smoked.

71.     Despite the above data, Defendant has failed to disclose to consumers that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

72.     By delivering such potent doses of nicotine, JUUL products magnify the health risks posed by nicotine, significantly increase blood pressure, and place users at heightened risk for stroke, heart attacks and other cardiovascular events.

73.     Further, because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes. Thus, JUULpods are foreseeably exceptionally addictive when used by persons without prior exposure to nicotine—a fact not disclosed by Defendant.

74.     At the same time, as discussed above, the throat "hit" from nicotine salts is much lower than that for combustible tobacco products, making it easier to inhale. According to researchers, the "high total nicotine level (addictive delivery)" of a JUUL coupled with its easily inhalable nicotine vapor is "likely to be particularly problematic for public health."[38]

75.     This powerful combination—highly addictive and easy to inhale—also repeatedly exposes users to the toxic chemicals in the vapor, compounding the health risks to users, as described above.

---

[36] Jarvis *et al.*, Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey (Jan 2001), JNCI Vol. 93, Issue 2, 134–138 *https://academic.oup.com/jnci/article/93/2/134/2906355* (as of July 6, 2019)

[37] UCSF Library, 1003285443-5443 (US 85421).

[38] Duell Study, 431

76.     In addition to its nicotine content, the "Cool" Mint pods pose additional risks. The

FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on

menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had

drug-like effects, including "cooling and anesthetic effects that reduce the harshness of cigarette

smoke."[39] Mint could also "facilitate deeper and more prolonged inhalation," resulting in

"greater smoke intake per cigarette." *Id.* at 500-501.

77.     JUUL has fraudulently concealed material information about the addictive and

dangerous nature of its e-cigarettes. Defendant necessarily is in possession of all of this

information.

**C.     JUUL's Design Offers No Benefit for Young People like JASON GLUCH, Only Risk.**

78.     JUUL's design offers no benefit to young people like Plaintiff, who was not

addicted to cigarettes or any form of nicotine before they started using JUUL.

**D.     JUUL Conspired with Others in the Cigarette Industry to Engage Third-Party Spokespersons to Downplay the Risks of E-cigarettes, Create Doubt, and Misrepresent the Benefits of Nicotine.**

79.     Because JUUL understood that it could not specifically make health-related

claims without drawing the ire of the FDA, JUUL conspired with others, including Defendants

Pax Labs, Phillip Morris USA, Altria and unnamed Defendants Does 7-10, in the cigarette

industry to engage consultants, academics, reporters, and other friendly sources such as the

American Enterprise Institute, to serve as spokespersons and cheerleaders for e-cigarette

products.  Taking yet another page from the cigarette-industry playbook, these influencers

masked their connection to the e-cigarette industry, while serving as its mouthpiece to cast doubt

about risks and overstate benefits.

80.     For example, just as JUUL launched, cigarette company expert witness Sally

Satel published an article in Forbes Magazine touting the benefits of nicotine—claiming it aids in

---

[39] Proctor, Golden Holocaust: Origins of the Cigarette Catastrophe and the Case for Abolition, 500 (1st ed. 2011).

concentration—and stating that it is harmless.[40]  In another article, she lauded efforts by JUUL

and others to develop nicotine-related products, and cast any doubters as hysterical and creating

a "panic".[41]

81.     Numerous other articles, videos, and podcasts—also spread through social

media—echoed this same message that the public health community was overreacting to e-

cigarettes and in a panic about nothing.

82.     During each of its multiple fundraising rounds, JUUL assured potential investors

that addiction to something that is not harmful is not harmful, suggesting that JUUL was no more

harmful than coffee.

83.     On information and belief, JUUL and its co-conspirators spread this message

through hired third-party spokespersons and influencers.

84.     Furthering their campaign of doubt and confusion, when asked directly about

health risks, JUUL's employees and founders would point reporters to other sources to indicate

that its products had been shown to be safe, or not harmful, rather than admit what it knew were

the dangers.

85.     JUUL well-understood from the cigarette industry playbook that sowing doubt

and confusion over the benefits and risks of e-cigarettes is key to long-term success.  First, by

creating a "two-sides-to-every-story" narrative, JUUL reduced the barriers for young people and

new users to try the product, and gave addicted users permission to keep using the product and

avoid the pain of withdrawal.  Second, by engaging people who looked like independent experts,

JUUL staved off regulation and suppressed political opposition, allowing it a long runway to

---

[40] Satel, *Nicotine Itself Isn't The Real Villain* (Jun 19, 2015), Forbes,
*www.forbes.com/sites/sallysatel/2015/06/19/nicotine-can-save-lives/#60379f766f43* (as of July 5,
2019).
[41] Satel, *Why The Panic Over JUUL And Teen Vaping May Have Deadly Results* (Apr 11, 2018),
Forbes, *www.forbes.com/sites/sallysatel/2018/04/11/why-the-panic-over-juul-and-teen-vaping-
may-have-deadly-results/#6b1ec693ea48* (as of July 5, 2019).

capture market share.  Third, by belittling the public health community, JUUL neutered its most vocal threat.

86.     On information and belief, JUUL conspired with others in the cigarette industry to fraudulently conceal the risks of e-cigarettes, recognizing that a campaign of doubt, misinformation and confusion would benefit all of them and would be the key to the industry's survival.

**E.     JUUL Intentionally Misrepresents and Grossly Understates the Amount of Nicotine in each JUULpod.**

87.     From JUUL's pre-release announcements to this day, JUUL, Phillip Morris USA, Pax Labs, Inc.,  along with Altria and unnamed Defendants Does 4 through 6 that provided marketing services to JUUL, has continuously falsely represented that each pod contains only as much nicotine as a pack of cigarettes. JUUL repeats these claims widely in advertisements, press releases, on its packaging, and on its web site.  For example, some JUUL advertisements and JUUL's website currently provides that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs."

88.     This statement is false and seriously misleading because, as JUUL knows, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and other health risks.

89.     Defendant knows that benzoic acid affects pH and "absorption of nicotine across biological membranes."[42]

---

[42] Benowitz *et al.*, Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology (Oct 12, 2010), Handb Exp Pharmacol 192: 29–60 *www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/* (as of July 5, 2019).

90.     Assuming a concentration of 59 mg/mL, JUUL's reported nicotine content corresponds to about 40 mg of nicotine per 0.7 mL JUULpod. If, as JUUL claims, this is equivalent to one pack of cigarette (or 20 cigarettes), that implies 2 mg of nicotine per cigarette.

91.     JUUL's equivalency claim further assumes 10 puffs per cigarette (i.e., 200 puff per pack), or 0.2 mg (200 μg) of nicotine per puff.

92.     Typically, a cigarette that delivers around one milligram of nicotine in smoke retains "about 14-20 milligrams of nicotine in the unsmoked rod," *USA v. Philip Morris, Inc.* (D.D.C. 2006) 449 F.Supp.2d 1, 567, for an overall delivery of 5-7% of the cigarette's actual nicotine content. A study by the Center for Disease Control found that in "commercial cigarette brands, nicotine concentrations ranged from 16.2 to 26.3 mg nicotine/g tobacco (mean 19.2 mg/g; median 19.4 mg/g)."[43] Assuming an average of 19 milligrams of nicotine per cigarette, an average pack of cigarettes contains 380 milligrams of nicotine, or six times as much nicotine as the 62 milligrams reported for each JUULpod. Yet the average pack would be expected to deliver only 5-7% (19-27 mg) of its nicotine content to the user. In line with this expectation, a study of thousands of smokers found smokers in taking between 1.07 to 1.39 milligrams per cigarette (21.4-27.8 mg per pack).[44] This is less than half of the amount of nicotine contained in a JUULpod (i.e., 2 mg per "cigarette" based on JUUL's stated concentration, or 200 μg per puff assuming 100% delivery). Even with the slightly lower efficiency of delivery demonstrated in studies like Reilly (about 82%, for averages of 164 μg per puff), this amounts to a substantially higher amount of nicotine that a human will absorb from a JUULpod than from smoking a pack of cigarettes.

---

[43] Lawler *et al.*, Surveillance of Nicotine and pH in Cigarette and Cigar Filler(Apr 1, 2018), Tob Regul Sci. 3(Suppl 1): 101–116, *www.ncbi.nlm.nih.gov/pmc/articles/PMC5628511/* (as of July 5 2019).

[44] Jarvis *et al.*, Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey (Jan 17, 2001), JNCI, Vol. 93, 2:134–138, *www.ncbi.nlm.nih.gov/pubmed/11208883* (as of July 5 2019).

93.     JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is therefore literally false and likely to mislead, because the amount of nicotine contained in the JUUL pod is perhaps six times less than in a pack of cigarettes, but the actual amount of nicotine consumed via JUUL pod is as much as twice as high as that via cigarettes.  This fact is never mentioned by Defendants.

94.     Further, while a pack of cigarettes contains 20 cigarettes which each have to be separately lit, the JUUL can be inhaled continuously, and often can be used indoors without detection by others, a feature that JUUL promoted heavily in its advertisements, eliminating the need for smoking breaks. Thus, the device design leads users to intake far more nicotine than would occur with cigarettes.

95.     Finally, the JUUL device does not have a manual or automatic "off" switch. On information and belief, neither the JUUL pod nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the upper bound of a cigarette. Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL allows non-stop nicotine consumption, which is limited only by the device's battery. As a result, the JUUL is able to facilitate consumption of extraordinarily high levels of nicotine that a cigarette cannot match. This makes it easier for the user to become addicted to nicotine and poses additional health risks.

96.     Contrary to Defendant's representations, the above data indicate that each JUUL pod delivers significantly more nicotine than a pack of cigarettes, both per pack and per puff. JUUL's products thus have the foreseeable effect of luring youth, who react positively to a strong nicotine "kick," and exacerbating nicotine addiction and adverse health effects associated with nicotine consumption.

97.     Thus, JUUL is more harmful when compared to cigarettes, in that the extraordinarily high levels of nicotine can cause heightened blood pressure and stroke, and the repetitive exposure to the toxins and chemical in JUUL can also cause vascular damage and stroke.

**F.**   **Defendants Never Warned Plaintiff that JUUL's Products Were Unsafe, Addictive, and Dangerous.**

98.    At no time before Plaintiff became severely addicted did JUUL, Altria, Pax, Phillip Morris USA, Inc. nor any of the other unnamed Defendants involved in the research, development, marketing and distribution of JUUL products provide any warnings about the risks of severe addiction, BOOP, mood disorders, stroke, or other brain damage or injuries.

99.    At no time before Plaintiff became severely addicted did Defendants warn Plaintiff that JUUL products were unsafe for him, nor instruct him on how much JUUL would be safe to consume.

100.    Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018, far too late for Plaintiff. Defendants involved in the research, development, marketing of JUUL products and e-cigarettes provide any warnings. The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUULpods away from children and pets, but contained no warnings specifically about the known effects, or possible long-term effects, of nicotine or vaping/inhaling nicotine salts.  Many of JUUL's advertisements, particularly before November 2017, also lacked a nicotine warning.

101.    Furthermore, JUUL misrepresents the nicotine content of JUULpods by representing it as 5% strength. As discussed above, JUULpods contain more than 5% nicotine by volume, and deliver it in a form that is particularly potent.

102.    Instead, JUUL marketed its JUUL products as an "alternative to cigarettes," thereby giving the false impression that they are not harmful like traditional cigarettes and safe to use.

103.    Plaintiff did not and could have known the risks associated with JUUL, because Defendant had exclusive knowledge about its product, including its design, and concealed that information from him.

104.    Instead, as a result of JUUL's wildly successful marketing campaign, based on tactics developed by the cigarette industry and amplified in social media, Plaintiff reasonably believed that JUUL was safe, harmless, fun, and cool—a thing to do with friends.

105.    A 2017 study by the Truth Initiative Schroeder Institute® found that 6 percent of youth and 10 percent of young adults have used a JUUL e-cigarette in the last 30 days. The study also found that while many young people are aware of JUUL, many are unaware that the product always contains the addictive chemical nicotine.

a.    Twenty-five percent of survey respondents aged 15 to 24 recognized a JUUL e-cigarette device when shown a photo of the product.

b.    Among those who recognized JUUL, 25 percent reported that use of this product is called "JUULing," indicating that this product is so distinctive, it is perceived as its own category.

c.    Fully sixty-three percent of JUUL users did not know that this product always contains nicotine.

**G.    Despite knowledge that its products were unsafe for anyone particularly young people, JUUL Deployed a Deceptive and Unfair Viral Marketing Campaign to Entice Young People to Start JUULing**

106.    As described further below, Defendant has used the same strategies perfected by the cigarette industry to sell JUUL products to young people. In particular, JUUL has both exploited regulatory loopholes and relied heavily on social media and other viral advertising tools to hook people, and in particular young persons, on its addictive e-cigarettes.

107.    To accomplish this, JUUL adopted the same themes used by Philip Morris and other cigarette companies in the industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and deleterious health effects.

108.    Defendants provided the strategies, analyses, and services to JUUL enabling and in furtherance of JUUL's deceptive and unfair marketing tactics.

### 1.    Overview of Viral Marketing Campaigns and Online Marketing

109.    "Viral marketing" is defined as "marketing techniques that seek to exploit preexisting social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[45] Viral marketing is a form of word-of-mouth recommendation that harnesses the network effect of the internet to rapidly reach a large number of people. Because the goal in a viral marketing campaign is to turn customers into salespeople who repeat a company's representations on its behalf, a successful viral marketing campaign may look like millions of disconnected, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaign.

110.    Companies may use different media to transmit their viral messaging, but generally, all viral marketing campaigns tend to share similar features, including (1) a simple message—typically implied by an image—that elicits an emotional response; (2) the strategic use of marketing platforms, especially social media, to reach and engage the target audience; (3) use of content that invites participation and engagement; and (4) use of third parties to magnify the impact of a message.

111.    Typically, a viral marketing campaign will begin with a "push" by the company seeking to advertise the product, and since the advent of social media, that push is typically done through the creation of new content on a social media platform, such as Instagram, YouTube, Twitter, Facebook or other similar platform ("Social Medial Platforms").[46] A company that wants to push an ad on Social Media Platforms has a few options. First, the company can solicit followers to its social media pages, so that when the company posts to its feed, the content would be delivered to those followers and to those who visited the company page. Second, the company can purchase paid advertisements that were delivered to specified target audiences. Then, to

---

[45] Larson, The Rise of Viral Marketing through the New Media of Social Media (2009), Liberty University Pub., *https://digitalcommons.liberty.edu/ cgi/viewcontent.cgi?article=1009&context=busi_fac_pubs* (as of July 5, 2019).

[46] Skrob, The viral marketing concept as a model for open source software to reach the critical mass for global brand awareness based on the example of TYPO3 (Aug 2005), University of Applied Science Kufstein, Austria, *http://citeseerx.ist.psu.edu/viewdoc/ download?doi=10.1.1.494.8779&rep=rep1&type=pdf* (as of July 5, 2019).

amplify a message, companies can utilize other tools, such as paid influencers and strategic use of promotions and hashtags, to blanket the targeted demographic with advertisements across social media.

112.    Companies seeking to advertise new products or reach a new demographic have discovered the power of the "like" and "share" features on social media, which allow users to promote content to their own audiences. As Mark Zuckerberg, founder and Chief Executive Officer of Facebook explained: "Nothing influences people more than a recommendation from a trusted friend…A trusted referral is the Holy Grail of advertising."[47]

113.    With the advent of social media, viral marketing campaigns have become a particularly effective way to reach young people, particularly teenagers. Teenagers tend to use social media far more than adults, and tend to be more susceptible to peer pressure. 95% of teens report having use of a smart phone.[48] 45% report being online "constantly." *Id.* 85% use YouTube. *Id.* 72% use Instagram, and 69% use Snapchat. *Id.* Adolescents also have a far stronger herding instinct than adults. The desire to fit in and look cool means that adolescents drive new trends online. As many businesses know, young people are often skeptical of traditional advertising and the tactics of large corporations. Thus, by pushing a viral marketing campaign, these businesses can reach consumers who might ignore typical advertising and are more likely to respond to an advertisement that does not look or feel like an advertisement, but instead is a message shared by a friend, a peer, or some other person influential to the viewer.

114.    Companies can also take viral messaging off-line. By running simple, catchy ads with minimal text and graphic visuals, and displaying those ads in various forms, companies generate buzz and discussion, which is reinforced through social media.

---

[47] *https://www.ft.com/content/01341240-8cbd-11dc-b887-0000779fd2ac* (last accessed Dec. 13, 2018). See also Perkins v. LinkedIn Corp. (N.D. Cal. 2014) 53 F.Supp.3d 1190, 1210 ("One of the principal reasons such viral marketing is superior to other forms of marketing is the source: viral marketing comes from a friend or contact with whom the recipient is familiar and trusts as opposed to an unfamiliar or untrusted source.").

[48] Anderson & Jiang, Teens, Social Media & Technology 2018 (May 31 2018), Pew Research Center, *www.pewinternet.org/2018/05/31/teens-social-media-technology-2018/* (as of July 5, 2019).

2. **The Cigarette Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors To Hook New Underage Users On Its Products.**

115.    To remain profitable, the tobacco industry must continue to woo new customers: some existing customers wean themselves from addiction and the others eventually die, so replacement customers are needed. In recent years, tobacco usage in the United States has fallen dramatically, with particularly large decreases in the youth smoking rates, which cigarette companies have been vigorously trying to counteract. The cigarette industry knows that the younger a person starts smoking, the longer they will have a customer. Historically, cigarette companies fought to increase share penetration among the 14-24 age group because "young smokers have been the critical factor in the growth" of tobacco companies, and "the 14-18 year old group is an increasing segment of the smoking population."[49] The importance of the youth market was illustrated in a 1974 presentation by RJR's Vice-President of Marketing who explained that the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14 24 age group matures, they will account for a key share of the total cigarette volume - for at least the next 25 years."[50]

116.    It is well-established that "marketing is a substantial contributing factor to youth smoking initiation." *USA v. Philip Morris* (D.D.C. 2006) 449 F. Supp.2d 1, 570.

117.    Because teenagers are at a stage in their psychosocial development when they are struggling to define their own identities, they are particularly vulnerable to image-heavy advertisements providing cues for the "right" way to look and behave amongst peers. *Id.* at 578. Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation. *Id.* at 570, 590. By making smoking a signifier of a passage into adulthood, tobacco companies turned smoking into a way for teenagers to enhance their image in the eyes of their peers. *Id.* at 1072

---

[49] Memo to: C.A. Tucker from: J.F. Hind Re: "Meet the Turk" (January 23, 1978) *http://legacy.library.ucsf.edu/tid/lve76b00* (last visited June 5, 2018).
[50] Mr. C.A. Tucker Presentation to RJRI BOfD - 9/30/74 (740930), "Marketing Plan" (1974), *www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091* (as of July 5, 2019)

118.    The landmark *USA v. Philip Morris* case revealed that tobacco companies targeted adolescents for decades by: "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion strategies to knowingly reach teenagers." No. 99-cv-2396, ECF 5732,

¶ 2682 (D.D.C. 2008). In terms of images and themes that cater to adolescents, the court found "overwhelming" evidence that tobacco companies intentionally exploited adolescents' vulnerability to imagery by creating advertising emphasizing themes of "independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being 'cool.'" *Id.* at ¶ 2674.

119.    Thus, the industry has long used viral marketing campaigns to push its products on children, teens, and young adults. Prior to the advent of the Internet, cigarette companies engaged in "viral advertising" or "influential seeding" by paying "cool people" to smoke in select bars and clubs, with the "idea being that people will copy this fashion, which would then spread as if by infection."[51] By simply paying some attractive, stylish third parties to use the product in trendy public places, tobacco companies were able to create buzz and intrigue. As word spread, the public would develop a strong association that smoking was what young, cool adults were doing.

120.    Today, cigarette manufacturers like Defendant Altria are limited in their ability to advertise in the United States, but actively use viral marketing techniques outside of the United States. For example, Japan Tobacco International, one of JUUL's early investors, launched social media campaigns including a "Freedom Music Festival" promoting Winston cigarettes in Kazakhstan Kyrgyzstan, and Jordan. Similarly, Phillip Morris International, a spin-off of Defendant Altria, JUUL's largest stakeholder, has used influencer campaigns in multiple countries. A campaign in Indonesia called "I Decide To" has been viewed more than 47 million

---

[51] Golden Holocaust, 119 (citing Ted Bates and Co., Copy of a Study of Cigarette Advertising Made by J.W. Burgard; 1953, (Lorillard), n.d., Bates 04238374-8433.

times online. A hashtag marketing campaign called #NightHunters in Uruguay used paid influencers to pose with menthol cigarettes and was seen by nearly ten percent of Uruguay's population.[52]

121.    An influencer paid to promote Philip Morris brands stated that Philip Morris targets a "super young profile" for its influencers . . . . the people they selected are always the youngest. They look for young people that have large groups of friends so [the social media promotional message] gets expanded more and more." *Id.* Another influencer allegedly stated that "we had a training session with the person in charge of marketing in Marlboro, she talked to us about how difficult it was for them to advertise due to all the laws in place. She also talked to us about . . . [linking] the brand to certain colors or situations." *Id.* (brackets in original).

122.    A study carried out by the campaign for tobacco-free kids, reported that "tobacco companies are secretly paying social media stars to flood your newsfeed with images of their cigarette brands." *Id.* In a nutshell, "young social media stars are paid to make smoking look cool." *Id.* A gallery of influencer posts is available at:

*https://www.takeapart.org/wheretheressmoke/gallery/.*

123.    Similarly, in 1988 the R.J. Reynolds Tobacco Company introduced the infamous Joe Camel cartoon campaign, which faced instant criticism due to how appealing the cartoon animal was to children and teens. Joe Camel was drawn as sleek, metropolitan figure, typically wearing sunglasses or a tuxedo, or was depicted driving convertibles, gambling, or playing pool. The ads often used the phrase "Smooth Character," which to teenagers, meant he had a slick, cool personality. That in turn led to an association between smoking and coolness in the minds of young people. To ensure that message stuck, R.J. Reynolds put up billboards featuring Joe Camel near schools, and printed Joe Camel shirts, hats, and other paraphernalia, ensuring the campaign would be carried far and wide, and that kids would constantly be exposed to it. Only

---

[52] *New Investigation Exposes How Tobacco Companies Market Cigarettes on Social Media in the U.S. and Around the World* (Aug 27, 2019) Campaign For Tobacco-Free Kids *www.tobaccofreekids.org/press-releases/2018_08_27_fic* (as of July 5, 2019).

three years after the campaign began, in 1991, the Journal of the American Medical Association

published a study showing that by age six nearly as many children could correctly respond that

"Joe Camel" was associated with cigarettes as could respond that the Disney Channel logo was

associated with Mickey Mouse, and it alleged that the "Joe Camel" campaign was targeting

children, despite R. J. Reynolds' claim (similar to the claim of Defendants here) that the

campaign was directed only to adults who were already smokers of other brands.[53] At that time

researchers estimated that 32.8% of all cigarettes sold illegally to underage buyers were

Camels.[54] The Joe Camel campaign ended under the pressure of an impending civil trial brought

by the City Attorney in San Francisco, Congressional investigation, and public pressure.[55]

124.    Cigarette companies have also known for decades that flavored products are key

to nicotine adoption by youth. A 1972 Brown & Williamson internal memorandum titled "Youth

Cigarette – New Concepts," observed that "it's a well known fact that teenagers like sweet

products."[56] A 1979 Lorillard memorandum found "younger" customers would be "attracted to

products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing

switching study data from the company which produces 'Life Savers' as a basis for determining

which flavors enjoy the widest appeal" among youth.[57] A 2008 study found that 17-year-old

smokers were more than three times as likely as those over the age of 25 to smoke flavored

cigarettes, and they viewed flavored cigarettes as safer.[58] Cigarette companies also used

---

[53] Fischer *et al.*, Brand Logo Recognition by Children Aged 3 to 6 Years (Dec 11, 1991), JAMA 266(22):3145-8, *www.ncbi.nlm.nih.gov/pubmed/1956101* (as of July 5, 2019).

[54] DiFranza *et al.*, RJR Nabisco's cartoon camel promotes camel cigarettes to children (Dec 11, 1991) JAMA 266(22):3149-53, *www.ncbi.nlm.nih.gov/pubmed/1956102* (as of July 5, 2019). (The JUULs represent an even higher percentage of all cigarettes and e-cigarettes sold to minors.)

[55]Joe Camel, Wikipedia https://en.wikipedia.org/wiki/Joe_Camel#cite_note-8 (as of July 5, 2019).

[56] Brown & Williamson official A.J. Mellman, (1983) Tobacco Industry Quotes on Nicotine Addiction, *www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes %20on%20Nicotine%20Addiction.pdf* (as of July 5, 2019).

[57] Flavored Tobacco FAQs, Students Working Against Tobacco, (citing, Sedgefield Idea Sessions 790606-790607. June 8, 1979. Bates No. 81513681/3691) *http://swatflorida.com/uploads/fightresource/Flavored%20Tobacco%20Industry%20Quotes%20 and%20Facts.pdf* (as of July 5, 2019)

[58] Klein *et al.*, Use of flavored cigarettes among older adolescent and adult smokers: United

advertisements that paired cigarettes with foods, to make it seem like cigarettes were part of a healthy meal.

**H.** **Because Advertising Fuels Youth Smoking, Tobacco Companies are Prohibited from Viral Marketing Practices and Use of Flavors**

125.    Most of the activities described in the section above are now recognized as against public policy, and thus forbidden for cigarette companies.

126.    Under the Tobacco Master Settlement Agreement ("MSA"), reached in 1998, participating manufacturers agreed not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State." MSA, § III(a). They are also prohibited from

a.    using outdoor advertising such as billboards,

b.    sponsoring events,

c.    giving free samples,

d.    paying any person "to use, display, make reference to, or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media," which includes "any motion picture, television show, theatrical production or other live performance," and any "commercial film or video,"; and

e.    paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing.

127.    In 2009, the FDA banned flavored cigarettes pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. Then-FDA commissioner Dr. Margaret A. Hamburg announced the ban because "flavored cigarettes are a gateway for many children and young adults to become regular smokers."[59]

---

States, 2004-2005. (Jul 2008) Nicotine Tob Res. 10(7):1209-14, *https://www.ncbi.nlm.nih.gov/pubmed/18629731* (as of July 5, 2019).
[59] Harris, *Flavors Banned From Cigarettes to Deter Youth* (Sep 22, 2009), The New York Times, *www.nytimes.com/2009/09/23/health/policy/23fda.html* (as of July 5, 2019).

128.    The Tobacco Control Act of 2009 also prohibited sales of cigarettes to minors, tobacco-brand sponsorships of sports and entertainment events or other social or cultural events, and free giveaways of sample cigarettes and brand-name non-tobacco promotional items.

129.    A study of the cigarette flavor ban in 2017 found that the flavor ban was effective in lowering the number of smokers and the amount smoked by smokers, but also was associated with an increased use of menthol cigarettes.[60] The same study reported that 85% of adolescents who use e-cigarettes use flavored varieties.

### 2.    JUUL's Marketing Leveraged Banned Strategies Perfected by Cigarette Companies to Induce Minors and Young Non-Smokers to Purchase JUUL Products

130.    Following the successful model of its predecessors, since 2015, JUUL, in conjunction and in concert with Altria and unnamed Defendants Does 4 through 6 involved in providing marketing services to JUUL, has been operating a long-term viral marketing campaign aimed at teenagers and young adults. This campaign extends and expands upon deceptive advertising tropes used by tobacco companies to exploit the psychological needs of consumers—especially youth—to convert them into smokers.



131.    JUUL's admitted reliance on tobacco industry documents is apparent in a collection of JUUL advertisements compared to historical cigarette advertisements on Stanford's Research into Impact of Tobacco Advertising ("SRITA") website. The side-by-side comparison of numerous JUUL advertisements shows that its imagery directly parallels that

---

[60] Courtemanche *et al.*, Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use (May 2017), Am J Prev Med 52(5):e139-e146, *www.ncbi.nlm.nih.gov/pubmed/28081999* (as of July 5, 2019)

adopted by cigarette manufacturers, including imagery relating to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.

132.    Because of social media, JUUL has been able to operate an even more pervasive, insidious, and successful viral marketing campaign than its predecessors in this industry. As set forth below, JUUL developed and oversaw a long-term viral marketing campaign with the intent to convince young people to purchase its products. JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

133.    JUUL carried this campaign out by: (i) intentionally designing a campaign that was simple and would trigger an emotional response, particularly with young people; (ii) intentionally designing flavored products that would appeal to teenagers and young adults; (iii) directing its advertising to teenagers and young adults on social media; (iv) utilizing third party influencers to amplify its message around the internet; (v) utilizing other social media tools, such as hashtags, to encourage participation and word-of-mouth messaging by its customers; (vi) amplifying the message through off-line advertising; and (vii) using a pricing and distribution model designed to put the product within reach of youth.

134.    JUUL's advertisements consistently withheld material information about the dangers of the product. Through this long-term advertising campaign, JUUL was able to persuade consumers, and in particular teenagers and young adults that its product was cool, while hiding from them the dangers associated with using the product. And because of the viral nature of JUUL's marketing, JUUL promotions continue to reach youth, despite JUUL's deactivation of its social media accounts.

### 3.    JUUL Advertising Used Imagery that Exploited Young People's Psychological Vulnerabilities.

135.    Throughout the relevant period, JUUL ran a consistent, simple message on social media that communicated to people, and in particular, teenagers and young adults that JUUL's products were used by popular, attractive, and stylish young adults (i.e., an idealized version of

an adolescent's future self) while failing to adequately and conspicuously disclose the nature or risks of the products.

136.    In designing the campaign, JUUL knew that to increase the chances that content goes viral amongst the teen demographic, it needed to design a campaign that was simple, would generate an emotional response that would resonate with teenagers, and obscure the fact that the product was unsafe and addictive.

137.    To help it design these ads, JUUL relied on various social media marketing companies. In 2015, JUUL worked with Cult Collective, instructing Cult Collective to design an ad campaign that would catch fire and reach customers who had "heard it all before." At the time, JUUL was a young company, competing with bigger, more established companies with large advertising budgets and high brand loyalty. The solution JUUL and Cult Collective reached was to position JUUL as a modern product that represented a better way of life for young people. That campaign was highly effective.

### 4.    JUUL's Launch Campaign Was Targeted to Create Buzz Among Young Consumers.

138.    To announce the JUUL's release in June 2015, JUUL launched the "Vaporized" advertising campaign that was aimed at a youth audience. [61] The campaign used young, stylish models, bold colors, and memorable imagery. The models were often using hand gestures or poses that mimicked teenagers.



---

[61] Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (Jun 23, 2015) ADAGE, *http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/* (as of July 5, 2019).



139.    JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

140.    The Vaporized campaign advertisements featured young, stylish models and images of attendees at JUUL's launch parties and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool." This Vaporized campaign targeted youth using the exact template established by the cigarette companies, decades earlier.

141.    Often the Vaporized ads contained the phrase "Smoking Evolved," so that consumers, and in particular youth, would associate JUUL with high tech and the latest generation of cool products, like iPhones and MacBooks.

142.    The color scheme chosen was similar to colors used by Natural Americans Spirit Cigarettes, a leading brand of cigarettes among teenagers.

143.    As the Cult Collective creative director explained, "We created ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations and a brand sponsorship strategy that aligned perfectly with those we knew would be our best customers."[62]

144.    As part of the Vaporized campaign, JUUL advertised on a 12-panel display over Times Square.

---

[62] Jackler *et al.*,  JUUL Advertising Over its First Three Years on the Market (Jan 31, 2019) Stanford Research into the Impact of Tobacco Advertising, Stanford University School of Medicine, http://tobacco.stanford.edu/tobacco_main/publications/ JUUL_Marketing_Stanford.pdf (as of July 5, 2019). (Citing, Cult Creative JUUL case study. http://cultideas.com/case-study/juul (last accessed September 21, 2018)). (emphasis added)



145.    Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement reached between 46 states' attorneys general and cigarette companies, but JUUL took advantage of that agreement's failure to foresee the rise of vaping products to advertise its nicotine products in a manner that had already been deemed against public policy for other nicotine products.

146.    To ensure that its message would spread, JUUL utilized several other tools to put its product in front of young people. First, it ran the Vaporized campaign in the front spread of Vice magazine's cover issue. Notably, Vice bills itself as the "#1 youth media brand" in the world and is known for running edgy content that appeal to youth. JUUL also implemented a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons, imitating pop-up restaurants and bars typically aimed at attracting young, hip urban consumers. Again, this is an activity which would have been prohibited by law for a cigarette company on the ground that it was against public policy.

147.    JUUL's chief marketing officer, Richard Mumby said "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product."[63] This reliance on images of young, diverse users was specifically aimed at convincing young people who were not previously addicted cigarette smokers to purchase JUUL products, to make the use of JUUL appear fun and without long-term negative consequences, to position the JUUL e-cigarette as the e-cigarette of choice for young adults, and to introduce youth to the "illicit pleasure" of using the JUUL products.[64]

148.    JUUL promoted the Vaporized campaign on Facebook, Instagram, and Twitter. The Vaporized campaign included the largest ENDS smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year and generated over 400 unique promotions.

149.    JUUL also sponsored at least 25 live social events for its products in California, Florida, New York and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, carried significant health risks or was addictive. Instead, the promised attendees "free #JUUL starter kit[s]," live music, or slumber parties. Photographs from these events indicate that they drew a youthful crowd. Use of sponsored events was a long-standing practice for tobacco companies, but is now forbidden.

150.    John Schachter, director of state communications for Campaign for Tobacco-Free Kids, expressed "concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design." Mr. Schachter said "the organization has noticed obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements, sponsorships and various flavors."[65]

---

[63] Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (June 23, 2015), AdAge, *http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/* (as of July 5, 20190

[64] Additional images and videos are available at *http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php* (as of July 5, 2019).

[65] Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign* (June 23, 2015), AdAge, *http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-*

151. To the extent that the Vaporized advertisements disclosed that JUUL products contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, if the same ads had been touting cigarettes, they would have been required to display a health warning in high contrast black and white in a box comprising 30% of the image.

### 5. JUUL Gave Away Free Products to Get New Consumers Hooked

152. JUUL distributed free starter packs at the live social events described above in paragraph 125—conduct forbidden for a cigarette company under the Tobacco Master SettlementAgreement, because it lured young people into nicotine addiction and related harms. BeCore, one of the firms responsible for designing and implementing JUUL's live events reported that "on average, BeCore exceeded the sampling goals set by JUUL . . . average number of samples/event distributed equals 5,000+."[66] At these events, BeCore distributed the appropriately-named JUUL "Starter Kits," which contain a JUUL and 4 JUULpods of varying flavors. If BeCore indeed gave away 5,000 Starter Kits per event, JUUL effectively distributed the nicotine equivalent of 20,000 packs of cigarettes at each of the 25 events described above— or the equivalent of 500,000 packs of cigarettes at all 25 events.



---

*campaign/299142/* (as of July 5, 20190

[66] Jackler *et al.*, JUUL Advertising Over its First Three Years on the Market, Stanford Research into the Impact of Tobacco Advertising, Stanford University School of Medicine (Jan 31, 2019), *http://tobacco.stanford.edu/tobacco_main/ publications/JUUL_Marketing_Stanford.pdf* (as of July 5, 2019).



153.   Though JUUL publicly acknowledged in October 2017 that it is unlawful to free samples of its products at live events, JUUL continued to do so, sometimes through $1 "demo events." Notably, promotions of this kind are prohibited for cigarette companies by the MSA.

154.   The effect—and purpose—of JUUL's Vaporized giveaways was to flood major cities with free product which by its addictive nature would hook tens or hundreds of thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JUUL's message to their friends via word of mouth and social media. Similar campaigns have long been used by drug cartels. This campaign unconscionably flooded cities with free samples of an addictive product, with distribution focusing on the youth market. As a foreseeable result, JUUL products ended up in the hands of non-smokers and youth, like Plaintiff, who used the products, became addicted to nicotine and suffered severe health consequences.

### 6.   **JUUL Portrayed Its Products as Status Symbols.**

155.   As tobacco companies have long known, young people—and adolescents in particular—find security and a sense of identity in status symbols. Even after the "Vaporized" campaign, JUUL's later advertisements mimicked the look and feel of the "Vaporized" ads to

foster the image of JUUL e-cigarettes and JUULpods as sleek, stylish, status symbol. For example, JUUL developed and ran a series of advertisements that were simple images of stylish young people using JUUL.

156.    All of these ads communicated to teenagers that JUUL was a product being used by cool, modern young people, which JUUL, like all cigarette companies, knows is a powerful message. None of these ads prominently disclosed the dangers of using JUUL.

157.    Other JUUL advertisements relied on graphic images with the look and feel of advertisements by Apple, Google, and similar tech companies with progressive and modern reputations. Again, these ads resonated with teenagers as well, as they made JUUL, and especially the flavored pods, look like cool gadgets or software, something akin to an iPhone or a hot new app to download. Like the other ads, none prominently disclosed the dangers of using JUUL.

158.    JUUL also consistently compared the JUUL to the iPhone through statements like "the iPhone of e-cigarettes," which JUUL posted on its website, distributed through social media, and disseminated through its email campaign. The iPhone is the most popular smartphone among adolescents, with 82% of teenagers preferring Apple's phone over the competition. JUUL's advertising images frequently include pictures of iPhones and other Apple devices, including iPads, Beats Headphones, MacBook laptops. Through these images, JUUL presented its image a "must have" technology product and status symbol, instead of a nicotine delivery system.

159.    Beyond triggering an emotional response in teenagers, all of JUUL's social media advertising had three additional things in common. First, through the use of clean lines, artistic arrangements, minimal text, and eye-catching graphics, JUUL ensured that the advertisements would jump out to distracted teenagers who scrolled crowded social media pages on their phones and browsers.

160.    Second, all of JUUL's advertisements reflect an understanding that social media users in general, and teenagers in particular, do not typically read long blocks of text on social media, and rely more heavily on imagery instead of text to convey a message. Many of the ads

did not include any warning about the dangers of JUUL or suggest to teenagers that the product contained nicotine.

161.    Moreover, where JUUL's advertisements appeared to contain such a disclaimer, this disclaimer was not typically seen when viewing social media due to the way the posts appear in phones and browsers. In particular, Facebook and Instagram typically only present to users the image and a couple lines of text, and viewers who want to see the entire post must click on it to open it up and read the rest.

162.    JUUL's Instagram advertisements obscure those nicotine warnings by placing them in a location that requires the user to open up the post and read it. As can be seen in JUUL's Instagram ads, the company consistently used brief text at the beginning of a post so that it would to be a complete sentence with no further content. Thus, the disclaimer was never visible to anyone viewing the posts in their main feed, and it was only seen by a limited number of people who elected to open the post and then read what was there. Notably, on Twitter, a Social Media Platform that is geared towards reading text, and on Facebook, where some users do read text, JUUL typically did not include the disclaimer in its advertisements.

163.    Third, JUUL's advertisements were typically creative, giving them the look and feel of "art." Thus, teenagers were drawn to the advertisements, holding their gaze on the ads for longer periods of time, and being more inclined to share the advertisement with others in their networks, thus accomplishing JUUL's goal: turning consumers into salespeople.

164.    Even JUUL's newer "alternative for adult smokers" tagline suggests to adolescents that JUUL-use is a symbol of status as an adult, which happens to be an advertising theme cigarette companies peddled to youth for decades.

### 7.    JUUL Used Flavors and Food Imagery to Attract Teenagers and Downplay Risks

165.    JUUL sells its JUULpods in a variety of sweetened flavors. It even advertised some of its flavors as though they were desserts in themselves. For example, it advertised its

crème brulee flavor using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." JUUL used imagery that looked like ads for a trendy coffee shop or restaurant.



166.    Again, none of these advertisements prominently disclosed that JUUL was addictive and unsafe.

167.    The tobacco industry has long known that sweetened cigarettes attracted young smokers. As discussed above, the FDA banned flavored cigarettes for that reason.

168.    The use of flavors that appeal to youth has a marked effect on e-cigarette adoption by young "vapers." A national survey found that that 81 percent of youth aged 12-17 who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month.

169.    Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[67] Another peer-reviewed study concluded that "Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their nonvaping peers, a new study has found."[68]

---

[67] Ambrose *et al.*, Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, *2013-2014* (Oct 26, 2015), JAMA 314(17):1871-1873
*https://jamanetwork.com/journals/jama/fullarticle/2464690*
[68] Primack *et al.*, Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults (Apr 2018), Vol. 131, Issue 4, 443.e1–443.e9, *www.amjmed.com/article/S0002-9343(17)31185-3/fulltext*

170.    Research also shows that when youth see flavored ENDS liquids advertisements, they believe the advertisements and products are intended for them.[69]

171.    The use of attractive flavors foreseeably increases the risk of nicotine addiction, and e-cigarette related injuries, as traditional cigarette product designs aimed at reducing the unpleasant characteristics of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to contribute to the risk of addiction.[70] Worse still, adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was tobacco-flavored.

172.    JUUL's kid-friendly flavors included Mango, "Cool" Mint, and Menthol. 74% of youth surveyed in a recent study indicated that their first use of a JUUL was of a flavored pod.[71] More than half of teens in a nationwide survey by the Wall Street Journal stated that they use ENDS because they like the flavors.

173.    When JUUL released what are now the two most popular flavors among youth: Mango and "Cool" Mint ("Cool Mint"), JUUL promoted those flavors on Instagram, Twitter, YouTube and Facebook—all of which are skewed toward young audiences.

174.    JUUL's Mango pods quickly became the runaway favorite among youth. The Mango pods are so popular that, incredibly, they noticeably increased the use of the word "mango" on the internet as a whole. Starting in early 2017, Google Trends reports a nearly five percent increase in year-over-year use of the word "mango" online.[72]

---

[69] McKelvey *et al.*, Youth say ads for flavored e-liquids are for them (Aug 29, 2018), Addict Behav. 91:164-170, *www.ncbi.nlm.nih.gov/pubmed/30314868* (as of July 5, 2019)

[70] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General, Chapter 4, Nicotine Addiction: Past and Present (2010) *www.ncbi.nlm.nih.gov/books/NBK53017/* (as of July 5th, 2019).

[71] McKelvey et al., Adolescents and young adults use in perceptions of pod-based electronics cigarettes (Oct 19, 2018), JAMA Netw Open. 1(6): e183535 *www.ncbi.nlm.nih.gov/pmc/articles/PMC6324423/* (as of July 5, 2019).

[72] *https://trends.google.com/trends/explore?date=2014-06-01%202018-12-05&geo=US&q=mango*

175.   "Cool" Mint became youths' second youth favorite flavor. The 2018 Duell Study found 94 mg/mL nicotine in a JUUL "Cool" Mint pod – nearly double the amount on JUUL's "5% strength" label would suggest.

176.   JUUL's advertising emphasized the flavors of its sweetened nicotine pods. Leveraging the flavors, JUUL advertised JUULpods as part of a meal, to be paired with other foods. In late 2015, JUUL began a food-based advertising campaign called "Save Room for JUUL." A play on the expression "save room for dessert," JUUL's campaign focused on the JUULpods' sweet flavors, and pairing them with foods. JUUL described its crème brulee nicotine pods as "the perfect evening treat," using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." In one 2016 email, JUUL bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."

177.   JUUL similarly promoted the Fruit Medley pods using images of ripe berries. JUUL described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint," and in a Facebook advertisement dated July 10, 2017, JUUL urged customers to "start your week with cool mint juulpods."[73] Along with the bright green caps of the "Cool" Mint JUULpods, the Facebook ad included an image of a latte and an iPad. *Id.*

178.   JUUL even hired celebrity chefs to provide pairing suggestions for JUUL flavors. On Instagram and Twitter, JUUL boasted about "featured chef" Bobby Hellen creating a "seasonal recipe to pair with our bruule pod." On Facebook, JUUL posted a link to an article on porhomme.com about "what our featured chefs created to pair with our pod flavors."[74] JUUL tweeted repeatedly about its flavors and encouraged its social media followers to share their preferred pairings.

---

[73] *https://airtable.com/tblkPVYIp5AFNLrTy/viwFFlmOJSzXHskhz/recEYkrXbuSCdZB0h*
[74] Facebook_10,
*https://airtable.com/tblkPVYIp5AFNLrTy/viwFFlmOJSzXHskhz/rec0vT9owbjQeVUuY.*



179.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture. JUUL's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee. This comparison to coffee was an intentional effort to downplay and minimize the risks of JUUL, suggesting it was no more risky than coffee.

180.    By positioning JUULpods as a delicious treat rather than a system for delivering a highly addictive drug with dangerous side effects, JUUL unfairly led consumers to the conclusion that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

181.    By modeling its nicotine pods' flavor profiles on sweets, naming its nicotine pods after those sweets, and using images of the sweets in JUULpod advertisements, JUUL conditioned viewers of its advertisements to associate JUUL with those foods. Through this conditioning process, Defendant sought to link the sight or mention of JUUL products to mental images of the fruits and desserts in JUUL's advertising, which would in turn trigger food-based physiological arousal including increased salivation and heart rate. These physiological responses, in turn, would make JUUL use more appealing.

182.    By 2017, JUUL knew that the foreseeable risks posed by fruit and candy-flavored e-liquids had materialized. A significant percentage of JUUL's customers included adolescents

who overwhelmingly preferred Fruit Medley and Crème Brulee over Tobacco or Menthol.[75] Instead of taking corrective action or withdrawing the sweet flavors, JUUL capitalized on youth enthusiasm for its products.

183.    JUUL disingenuously asserts that it did not intend its flavors to appeal to young people, including Plaintiff. After 11 senators sent a letter to JUUL questioning its marketing approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and Mango, JUUL visited Capitol Hill and told senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Sen. Dick Durbin (D-Ill.). JUUL's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

184.    In November 2018, in response to litigation and other mounting public pressures, JUUL announced that it had "stopped accepting retail orders" for many of its flavored JUULpods, such as mango, crème brulee, and cucumber.[76] But JUUL's promise is misleading. JUUL has only refused to sell them directly to retailers, but it still manufactures and sells the JUULpods. JUUL also continues to sell "Cool" Mint in gas stations knowing that the flavor is incredibly popular with youth and will become the de facto favorite if access to other flavors is removed.

185.    The only responsible solution to prevent flavored JUULpods from getting into the hands of young people is to stop manufacturing them.

---

[75] Truth Initiative, *JUUL fails to remove all of youth's favorite flavors from stores* (Nov 15, 2018), *https://truthinitiative.org/news/juulfails-remove-all-youths-favorite-flavors-stores* (as of July 5, 2019).

[76] Kaplan & Hoffman, *Juul Suspends Selling Most E-Cigarette Flavors in Store*s (Nov 13, 2018), The New York Times, *www.nytimes.com/2018/11/13/health/juul-ecigarettes-vaping-teenagers.html* (as of July 5, 2019).

8.     **JUUL Developed Point-of-Sale Advertising That Emphasized the
       Products' Positive Image Without Adequately Disclosing Its Nature
       and Risks.**

186.   The cigarette industry spends $8.6 billion a year in point-of-sale ("POS")

promotions—or almost $990,000 every hour.[77] In a 2009 study of adult daily smokers,

unintended cigarette purchases were made by 22 percent of study participants, and POS displays

caused nearly four times as many unplanned purchases as planned purchases. *Id.* at 4. Younger

smokers, in particular, are more likely to make unplanned tobacco purchases in the presence of

POS advertising. *Id.*

187.   Studies show that tobacco use is associated with exposure to retail advertising and

relative ease of in-store access to tobacco products. Some studies have shown that youth who

were frequently exposed to POS tobacco marketing were twice as likely to try or initiate

smoking than those who were not as frequently exposed. Frequent exposure to tobacco product

advertising and marketing at retail normalizes tobacco and smoking for youth over time and

makes them more likely to smoke. POS marketing is also associated with youth brand

preference. Research shows that young adult smokers prefer the tobacco brands marketed most

heavily in the convenience store closest to their schools.  Before its launch in 2015, JUUL and

Cult Collective developed innovative packaging and creative in-store displays that would carry

their message through into stores.

188.   In particular, they designed bright, white packages. The packaging looked similar

to iPhone packaging, which JUUL knew would resonate with young people, and because it was

solid white, the packaging stood out and caught people's eyes when displayed in store shelves.

This packaging buttresses Defendant's online marketing of JUUL e-cigarette as "the i-Phone of

Ecigs," thereby framing them as a cool, fashionable item to own and use. JUUL posters and

signs at the point of sale also promoted JUUL's flavors. From 2015 through late 2018, JUUL

promoted JUUL products and JUUL flavors at the point of sale without disclosing that the

---

[77] *The Truth About Tobacco Industry Retail Practices,* Truth Initiative,
*https://truthinitiative.org/sites/default/files/media/files/2019/03/Point-of-Sale-2017_0.pdf* (as of
July 5, 2019)

products contained nicotine or warning that the products could lead to addiction. Instead, JUUL's promotions displayed the colorful JUULpod caps and their food-based names while omitting that JUUL delivers nicotine, is addictive, carries risks of stroke and other cardiovascular events.



189.    For many, JUUL's POS materials provided an introduction to the brand. Because JUUL's POS materials omitted the most material features of JUUL's product—that it is a powerfully addictive nicotine delivery system—young people who saw JUUL's POS and were later offered a JUUL would have no reason to think that what they were being offered JUUL contained nicotine, or posed risks of addiction, or was unsafe.

### 9.    JUUL Used Social Media to Inundate Target Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products

190.    JUUL not only designed its advertising with an eye to what might be appealing to young people, but set about disseminating those ads to ensure that young people see them. JUUL set out to advertise on at least three major social media platforms: Instagram, Facebook, and Twitter, and disseminated the information in various ways across the platforms.

191.    On information and belief, JUUL maintains active accounts on most social media platforms, including Instagram, Facebook, and Twitter, where JUUL tweeted nearly 5,000 times in 2017 alone. As of 2016, 76 percent of American teens age 13-17 used Instagram, 66 percent of

teens use Facebook, and 44 percent of teens use Twitter.[78] While JUUL continues to maintain its Twitter page, it deleted nearly all content from its Instagram and Facebook pages around November of 2018, in response to lawsuits.

192.    JUUL was able to deliver content directly on social media using two approaches. First, it could post its advertisements directly to its own page, where it would be viewed by those who followed JUUL, and those who shared its posts ("Unpaid Advertising"). And it could engage in paid advertising, whereby it could target specific demographics of people to ensure they received its advertisements ("Paid Advertising").

193.    With respect to Unpaid Advertising, Instagram was the centerpiece of JUUL's teen-focused advertising blitz. Instagram is used overwhelmingly by teenagers. At least 72% of teenagers in the United States have an Instagram account, and at least 63% of teenagers between the ages of 13 and 17 use Instagram every day.[79] While increasingly more adults are using Instagram, this has been a recent development, and thus, advertisers typically only use Instagram if they are interested in marketing to young people, especially teenagers.

194.    Because of the way Instagram delivers content, Instagram allowed for fast, effective delivery and sharing of its graphic, simple messages. Users would see these images simply by scrolling through their feeds.

195.    JUUL also disseminated Unpaid Advertising across social media through its use of hashtags. Hashtags are simple phrases preceded by a #, and they operate as a way of cataloguing posts. Authors of posts use hashtags if they want their posts to be discovered and seen by people outside of their networks. On most social media platforms, users can find

---

[78] Snapchat And Instagram Are The Most Popular Social Media Platforms Among American Teens, The Associated Press-NORC Center for Public Affairs Research, *http://apnorc.org/projects/Pages/HTML%20Reports/instagram-and-snapchat-are-most-popular-social-networks-for-teens.aspx* (as of July 5, 2019)

[79] Smith & Anderson, Social Media Use in 2018: A majority of Americans use Facebook and YouTube, but young adults are especially heavy users of Snapchat and Instagram (Mar 1, 2018), Pew Research Center, *www.pewinternet.org/2018/03/01/social-media-use-in-2018/* (as of July 5, 2019).

information by doing a search for a hashtag with that key word. Thus, people interested in JUUL, could enter into the search bar on most Social Media Platforms "#JUUL" to find posts that include that hashtag. Instagram takes it one step farther and allows users to set up their accounts so that posts with a certain hashtag are automatically delivered to their feed.

196.    JUUL's hashtag marketing played a central role in the viral spread of JUUL between teenagers. The use of hashtags in social media advertisements "can be used to get your content in front of a bigger audience, raise awareness about your brand, target a very specific group of people, boost your SEO, and use hot trends and topics to your advantage.[80] Hashtags are "the best weapon in your arsenal, aside from influencer marketing" for getting content "in front of its intended audience." *Id.* Through hashtag marketing, brands can Join in on trending topics, engaging "an insane amount of readers" by using "hashtags which aren't closely related to your industry" by, e.g., using holiday-related hashtags. *Id.* By using "branded hashtags" that include the company's name or a specific product, advertisers can monitor the performance of specific campaigns. Another advantage of branded hashtags is user-generated content: "Every time a user puts one of your branded hashtags inside one of their posts, they are increasing your presence on social media" by promoting the branded hashtag, and the related content, to the user's followers. *Id.* Through successful hashtag marketing campaign, brands can create communities through which "followers will not only be able to communicate via chat or messages, but also connect with each other by using your hashtag." *Id.*

197.    From 2015 through 2018, JUUL used hashtag marketing consistently on Twitter, Instagram, and Facebook to promote its products. In various posts, JUUL would slip in hashtags so that their posts would be found by young people. This post is not a paid advertisement, but a post to JUUL's Instagram feed. JUUL used #TBT, which is an acronym for "Throwback Thursday." Throwback Thursday is a popular meme on social media, and teenagers are

---

[80] Ryan, *Hashtag Marketing: How to Use Hashtags for Better Marketing Campaigns*, Mention, *https://mention.com/blog/hashtag-marketing-how-to-use-hashtags-for-better-marketing-campaigns/* (as of July 5, 2019).

especially likely to understand it and use it. Thus, any teenager who had elected to follow the hashtag TBT would see this post when they logged into Instagram that day. Moreover, no one would see any warning regarding nicotine unless they actually opened the post. JUUL frequently used other hashtags that would be used by teenagers to push their product to them across social media, such as #icymi ("in case you missed it").

198.    JUUL also used hashtags to convert young users into salespersons through unpaid viral marketing.

199.    In disseminating Paid Advertising, the Social Media Platforms allow companies like JUUL to engage in micro-targeting, i.e., to select precisely what demographics of people should be exposed to its advertising. Social Media Platforms create internal profiles for the consumers that use them, tracking their online activity to determine their likes, habits, and purchasing power. When advertisers pay to disseminate ads, they can choose to target those ads so that they are received only by people whose digital footprint suggests an interest or predisposition to the product. JUUL would have had the option to exclude teenagers. It also could have elected to narrow its target audience to people with an interest in tobacco products, if it wanted to reach and convert non-smokers. Or it could target a broader audience of people whose digital footprints did not reveal that they were smokers.

200.    While JUUL's precise targeting methods are unknown, on information and belief, young people like Plaintiff is known to have been exposed to JUUL's Paid Advertising while on social media, suggesting that JUUL did not narrow its target audience to adult smokers

201.    Moreover, regardless of to whom JUUL targeted paid advertisements, JUUL's use of Paid Advertising was aggressive, and had the inevitable result of reaching teenagers, including Plaintiff. Paid advertising can be shared and liked just as Unpaid Advertising. JUUL relentlessly advertised to its targeted audience, across all Social Media Platforms. Plaintiff saw JUUL advertising frequently, regardless of what platform he used. The continual use of Paid Advertising increased the pressure to buy, and it has made it quitting harder due to the fact that

he is exposed to the advertising frequently through his phone and other personal electronic devices.

### 10.    JUUL Exploited Social Media to Target Young People

202.    To broaden the reach of its campaign, JUUL used "influencers" to push the product to young people. Influencers are "high-social net worth" individuals who have developed large social media followings – i.e., the "cool kids" of the social media world. People follow influencers because they tend to deliver lots of high quality, interesting photos and content, and because they are known to be trend-setters.

203.    Viewed as tastemakers and trendsetters by their followers, influencers are prized sources of brand promotion on social media networks. Companies seeking to market products often will pay influencers to advertise their products, similar to the ways in which they utilize "product placement" in movies. They seek out influencers with large amounts of followers in their target demographic, and will offer these influencers money or other deals to promote their products. The influencer then will create various posts on social media using the product. Typically, these posts are images of them using the product, but sometimes these posts will include videos, longer written reviews, or other information about the product. Influencers often include in these posts company-endorsed hashtags or links to the company's website to try to direct their followers to learn more. The company gets the benefit of having word-of-mouth advertising, and the influencer is able to attract more followers because those followers want to stay in the loop about new products and deals. While influencers operate on all Social Media Platforms, most of them rely primarily on Instagram.

204.    JUUL relied on influencers to carry out its viral marketing campaign. JUUL's reliance on influencers appears to have begun around June 2015, when JUUL listed a position on its website for a three-month Influencer Marketing Intern.[81] JUUL described the position as follows: "The Influencer Marketing Intern will create and manage blogger, social media and

---

[81] *https://www.internships.com/marketing/influencer-marketing-intern-i7391759* (last accessed Nov 14, 2018).

celebrity influencer engagements. . . to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social media channels, etc." (*Id.*). JUUL's efforts to solicit influencers appears to have been underway for years; until December 2018, JUUL's website still called for individuals to "Join the JUUL influencers." Applicants were required to disclose their profile information for Instagram, Twitter, and Facebook, as well as various other blog and vlog platforms, suggesting that JUUL was interested in understanding whether the influencers could help JUUL reach its targeted youth demographic.

205.    JUUL's outreach had its desired impact, as it was able to line up influencers to promote its products to teenagers, while spreading pictures of cool, young people using JUUL. In addition to all the means above, JUUL paid influencers and celebrities to promote JUUL, generating even more attention and exposure to young people, and reinforcing that the products were safe, cool, and fun.

206.    JUUL used or ratified multiple accounts across many social media sites to reach young people, even encouraging users to JUUL at school.

207.    JUUL also enjoyed the benefit of third-party promoters who reached hundreds of thousands of young people.

208.    JUUL allowed third parties, like @JUULnation to use its trademark. @JUULnation's Instagram post included tips on how to conceal JUUL in school supplies and ridiculed efforts to combat JUUL use among young people.  JUUL promoted @JUULnation on its own Instagram account.

209.    Cigarette companies are prohibited from conducting any of the practices described above under the Tobacco Master Settlement Agreement. Activities such as product placement in performances and professional videos have been identified as against public policy for nicotine products.

210.    One recent study concluded that JUUL was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . because there are no restrictions," on social media advertising. [82]

### 11.    JUUL Utilized a Pricing and Distribution Model Designed to Put the Product Within Reach of Youth Without Disclosing Harms.

211.    Cigarette companies for years sold youth-brand cigarettes at lower prices that young smokers could afford and used discounts and other promotions to ensnare them. JUUL is no different. It not only designed a marketing campaign to reach young people and entice new smokers, but it priced its products in such a way to ensure they would buy them.

212.    A pack of four JUULpods, which, according to JUUL, is the equivalent of four packs of cigarettes, costs approximately $13-$20. JUUL's website charges $15.99 for a pack of JUULpods, or about $4 per JUULpod. By contrast, a single pack of cigarettes in Connecticut costs approximately $9, and $13 in New York.

213.    For years, JUUL directed all of its product to gas stations. JUUL knows that teenagers and those new to smoking are likely to frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL would increase the chances that these people would purchase the product.

214.    To further drive curiosity and interest, and make it so its target audience, and especially teenagers, would purchase JUUL, JUUL instructed retailers to display the product in an unusual fashion. Whereas cigarettes and other tobacco products have long been kept behind the counter, JUUL designed display cases that would sit on store shelves. JUUL intentionally designed the clear display cases so that the bright white, sleek packaging and the flavors would catch consumers' eyes and make them interested in purchasing the product.

---

[82] Kelley, *JUUL Sales Among Young People Fueled by Social Media, Says Study* (Jun 4, 2018), The Washington Times, *www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/* (as of July 5, 2019).

215.    JUUL knew that by asking retailers to display JUUL products separate from other tobacco products, and within arms' reach, it would also suggest to consumers that JUUL was safer than traditional cigarettes and that it was not an addictive drug.

**I.      JUUL Used Non-Age-Restricted Emails to Promote and Track Its Products**

216.    Between 2015 and 2018, JUUL sent around 200 email promotions to customers and potential customers. JUUL's email subscription list was not age-restricted and, until recently, users who failed the age verification requirements on JUUL's purchase page were nevertheless added to JUUL's mailing list and emailed a coupon for a discount on a Starter Kit. The JUUL emails promoted retail locations, flavors, discounts, and "refer a smoker" programs. The emails also promoted JUUL's find-a-store locator.

217.    JUUL also used emails to distribute surveys. Because JUUL's emails were not age-restricted, neither were their surveys. On information and belief, JUUL thus collected data from minors. JUUL paid customers, including youth, up to $30 to complete some surveys.

**J.      JUUL Knew that its Scheme to Attract Young Smokers Like Plaintiff had Worked**

218.    Within a few months of the JUUL's commercial release in June 2015, a former JUUL executive reportedly told the New York Times that JUUL "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[83]

219.    JUUL tracked and closely monitored usage among youth through social media, online surveys, Youtube videos, hashtags, likes, email lists, and myriad other sources.

220.    By the end of 2015, young people had posted tens of thousands of videos on YouTube demonstrating ways to "JUUL in school" and in other locations without teachers, coaches or parents finding out.

---

[83] Richtel & Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth* (Aug 27, 2018), The New York Times, *www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html* (as of July 5, 2019).

221.    From the outset, JUUL was well-aware that a huge portion of its sales was going to persons like Plaintiff, but did nothing to curb, prevent, or mitigate the harms that its products could cause.

**K.    JUUL Created an Youth Vaping Epidemic and Exposed a New Generation to the Dangers of Nicotine Products.**

222.    JUUL's marketing and product design efforts have been wildly successful. Since its launch, JUUL is now the fastest growing e-cigarette in the country. Because the JUUL delivers more nicotine in a shorter amount of time than any other product, delivers that nicotine in a sweetened vapor that causes no irritation, and does so through a concealable device that can be consumed discretely in class, at home, and in the car, nicotine naïve users like Plaintiff frequently spiral into patterns of addiction with no historical precedent. It is not uncommon for teenagers, like Plaintiff, to consume one whole JUULpod a day, the nicotine equivalent of at least as many—and likely more—packs of cigarettes.

223.    Because JUUL's marketing turned the JUUL into a status symbol for teens, the acute nicotine addiction a JUUL fosters is frequently reinforced by the idea—which JUUL spread—that JUUL use is what "cool" popular kids do in high school. As a result, the medical community has found itself ill-equipped to develop a treatment for JUUL-addicted youth, as evidenced by a January 2019 FDA-sponsored meeting concerning the role of drug therapies in treating e-cigarette use.

224.    The vaping epidemic caused by JUUL has swept the entire nation in a short period of time. On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent Electronic Nicotine Delivery System ("ENDS") vaping from 2017 to 2018 were the *largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S.*" [84]

---

[84] Prieur, National Adolescent Drug Trends in 2018 (Dec 17, 2018), Institute For Social Research, The University of Michigan, *https://isr.umich.edu/news-events/news-releases/national-adolescent-drug-trends-in-2018/* (as of July 5, 2019).

225.    The percentage of 12th grade students who reported vaping nicotine almost doubled between 2017 and 2018, rising from 11% to 21%. The ten-percentage-point increase in 12th grade students who reported vaping nicotine (an indicator of nicotine addiction) is "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade." *Id.* "One in five 12th graders vaped nicotine in the last 30 days in 2018." *Id.* And because JUUL controls over 50% of the e-cigarette market, and was released immediately prior to the jump in vaping prevalence from 11% of teens to 21%, the entire increase in vaping prevalence since 2016 is attributable to JUUL.

226.    FDA Commissioner Dr. Scott Gottlieb has described the increase in e-cigarette consumption as an "almost ubiquitous – and dangerous – trend" that is responsible for an "epidemic" of nicotine use among teenagers.[85] The rapid –indeed infectious- adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products." *Id.* The Commissioner identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products." *Id.*

227.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."[86]

228.    Even more troubling are the challenges associated with getting kids to quit JUUL once they start. JUUL's aggressive social media campaign puts JUUL advertisements before them every day, all day. Those that want to stop thinking about it are faced with advertising when engaging in their regular activities. And even while JUUL has purportedly stopped advertising on social media in recent months, its hashtags, imagery, and impact live on, as there

---

[85] FDA launches new, comprehensive campaign to warn kids about the dangers of e-cigarette use as part of agency's Youth Tobacco Prevention Plan, amid evidence of sharply rising use among kids, U.S. Food & Drug Administration, (Sep 18, 2018), *www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm* (as of July 5, 2019)

[86] Surgeon General's Advisory on E-cigarette Use Among Youth (last updated Apr 9, 2019), CDC, *www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory/index.html (as of* July 5, 2019).

remain nearly 524,000 posts and counting on Instagram featuring the #juul hashtag as of July 8, 2019.

229.    Moreover, many medications for breaking nicotine addictions are approved only for adults.

230.    The inadequacy of quality control and other standards in the manufacture of JUUL raises additional, serious public health concerns regarding youth access and use. For instance, actual nicotine concentrations in JUUL can vary from advertised amounts, sometimes significantly exceeding the advertised concentration of nicotine. Because the concentration of nicotine in JUUL pods is already staggeringly high and potent, concentrations over the advertised amounts can increase the risk that users could become addicted or experience nicotine poisoning, or experience a spike in blood pressure which can result in serious illness or death. A related concern is the lack of full disclosure of all ingredients in e-liquids, some of which can also cause harm when inhaled.

**L.** **JUUL Implemented its Advertising Strategy with the Advice and Services of The Other Defendants**

231.    In order to implement such a diverse, wide-ranging advertising scheme, designed for the sole purpose of delivering its JUUL e-cigarette products to young consumers, JUUL worked in concert with an array of marketing, research and development, and distribution professionals.

232.    JUUL's advertising and marketing relied on the ideas, strategies, and advice of marketing and public relations entities.

233.    These entities, and unnamed Defendants Does 4 through 6, willingly and knowingly provided advertising expertise to JUUL, fully aware that JUUL would use these advertisements to target, sell to, and ultimately increase the number of young people consuming nicotine via its products.

234.    Defendants JUUL, Altria, Phillip Morris USA Inc., Pax Labs Inc. and Does 4 through 6 used their knowledge of how young adults use social media, interact with social media

posts, and are influenced by such posts, to create an advertising strategy designed to consistently, relentlessly, and exploitatively induce young adults and teenagers to use JUUL's JUUL e-cigarette products.

235.    Defendants provided their marketing services knowing that the marketing slogans, advertisements, and advertising methods they created were deceptive, provided no meaningful warning to users, and would necessarily mislead or otherwise falsely suggest that JUUL's JUUL e-cigarette products were not harmful, not addictive, or otherwise safe for use.

236.    Defendants expended time, money, and effort in order to design, create, and implement and pervasive advertising scheme whose sole purpose was to exploit and influence the minds of young adults into associating social status, popularity, desirability, and success with the purchase and consumption of JUUL's JUUL e-cigarette products.

237.    Defendants essentially used the playbook of cigarette and tobacco product advertising implemented by companies such as Philip Morris, in order to market JUUL e-cigarette products to young adults.

M.    **JUUL Unraveled Decades of Progress in Reducing Teen Smoking by Exploiting Regulatory Loopholes.**

238.    The teen vaping epidemic was by design, not by accident.

239.    When JUUL was first developed, the FDA's regulations on tobacco products were vague as to whether they applied to vaping devices. Because the regulations did not explicitly identify electronic vaping devices that dispensed tobacco and nicotine as a regulated product, JUUL interpreted those regulations to mean that it could sell its dangerous products to anyone, regardless of their age, and that it did not have to comply with the advertising and labeling restrictions that restricted other tobacco companies.

240.    As other vaping companies began to enter the market, JUUL no doubt knew that this gray area was unlikely to stay gray for long. Knowing that the clock was ticking, JUUL went on a wild spree to get as many young people addicted as possible while it still viewed itself as "unregulated." The aggressive advertising described above was designed not just to sell the

products to teenagers, but to sell the product to as many teenagers as possible while it still had a plausible defense to any assertion that it was violating FDA regulations. By hooking teens, JUUL not only ensured it would have loyal consumers for decades, but those teens would influence their friends.

241.   Moreover, by pumping social media platforms full of images of cool, young people having fun while JUULing, JUUL ensured that everyone from adults to young children, would think JUULing was a cool, fun, and safe activity. Just as RJR Reynolds learned with Joe Camel, even very young children would in turn be more likely to form strong, positive associations with the tobacco product and be more susceptible to trying it in the future.

242.   In 2017, the FDA announced that it would be taking steps to regulate vaping devices such as JUUL and other ENDS. Regulations were proposed and ultimately went into effect in late 2018.  But the damage was done, and it was too late for Plaintiff.

243.   In 2018, after the FDA opened an investigation and lawsuits were filed, JUUL set out to rewrite its history.  It has removed from its website and much of the internet images of glamorous young models seductively exhaling clouds of vapors.  JUUL's website now pictures middle-age adults in non-glamorous settings and suggests that JUUL solely exists for the benefit of adult smokers looking for an alternative.  Although JUUL now markets its product as a smoking cessation device ("Switch to JUUL"), it has not received FDA approval as a modified risk tobacco product or as a nicotine replacement therapy, and JUUL's e-cigarette has not participated in any FDA approval process analyzing its risks and benefits.  While JUUL has also announced some half-hearted voluntary measures to reduce access to young people, the cat cannot go back in the bag.  The viral marketing campaign and images live on, the candy flavors are still available, and the product remains designed to maximize the nicotine delivery for young people, leading to devastating health consequences.

244.   To this day, JUUL has not disclosed the health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of young people in harm's way.

### N.   JUUL USE CAUSED JASON GLUCH'S BOOP

245.    In the first published article in the medical literature, published in 2012, regarding respiratory illness occurring as a result of e-cigarettes, McCauley et al. report on the case of a 42-year-old woman admitted with a seven-month history of dyspnea, cough, and fevers, for which she had been given multiple courses of antibiotics after presenting to the emergency department, without improvement. Coinciding with the onset of symptoms the patient had begun using e-cigarettes. Chest imaging revealed "new multifocal bilateral opacities" and "extensive bilateral upper- and lower-lobe patchy ground glass pulmonary opacities in a 'crazy paving' pattern." All other testing, including immunological, was unremarkable. The patient was diagnosed with lipoid pneumonia, a "primarily chronic inflammatory reaction secondary to the presence of lipid substances in the lungs, with subsequent uptake by alveolar macrophages and accumulation in the interstitium." The authors also conjectured the source of the lipoid pneumonia was e-cigarette use, due to "glycerin-based oils found in e-cigarette nicotine vapor" added to "make the visual smoke when the solution is vaporized."[87]

246.    Another early case report linking respiratory illness with e-cigarettes is Thota et al., who reported in 2014 regarding a 20-year-old previously healthy U.S. active-duty male sailor who presented with a three-day history of "persistent cough, shortness of breath, and facial flushing" which began an hour after using an e-cigarette device. The patient had no history of exposure to pulmonary irritants and had experienced worsening of symptoms when using e-cigarettes again en route to the emergency department. Tachycardia and tachypnea were noted in his initial workup. Chest imaging found "subtle diffuse patchy reticulonodular opacities" and "predominantly diffuse ground-glass opacities involving the upper and middle lobes of the lungs more than lower lobes." The patient was administered antibiotics for presumed diagnosis of community-acquired pneumonia, but absence of microorganism infection upon bronchoscopy evaluation, nor indeed any other infectious etiology determined from subsequent testing, led to a

---

[87] McCauley L, Markin C, Hosmer D. An unexpected consequence of electronic cigarette use. Chest. 2012; 141(4):1110-1113.

diagnosis of acute eosinophilic pneumonia. The patient was given prednisone and discharged after five days in the hospital, with improvement of his symptoms and significant resolution of lung opacity.[88]

247.    Atkins and Drescher reported in 2015 a case of acute inhalational lung injury with electronic nicotine delivery systems (ENDS) with, importantly, positive rechallenge and dechallenge, significant indicators of an exposure being a causative effect for an outcome. A 60-year-old man with a history of cigar smoking was admitted with weakness, chills, and cough, which was treated with antibiotics and the patient discharged, and within three days he felt better. However, a month later the patient presented again with similar symptoms as well as a fever and hypoxemia, with "bilateral upper lung zone crackles and bilateral upper lobe predominant ground glass infiltrate on chest CT." The patient revealed before each emergency room admittance he had used e-cigarettes. The patient was diagnosed with "suspected acute hypersensitivity pneumonitis, related to ENDS" and had no further episodes with cessation of ENDS use. Repeat chest CT at three months post-diagnosis revealed normal pulmonary function.[89]

248.    Another case of lipoid pneumonia was reported in 2015 by Modi et al., who saw a 31-year-old woman admitted to hospital for dyspnea and cough. Chest imaging found "bilateral air space opacities" and "diffuse ground-glass opacities with interlobular septal thickening consistent with 'crazy paving' pattern" and despite antibiotic administration the patient "became increasingly hypoxic and was intubated due to concerns of acute respiratory distress syndrome." Bronchoalveolar lavage demonstrated "reactive pneumocytes and alveolar macrophages with positive staining (Oil-Red-O) for lipid content." Thus, the patient was started on IV steroids and diagnosed with lipoid pneumonia, given the close temporality of her recent initiation of e-

[88] Thota D, Latham E. Case report of electronic cigarettes possibly associated with eosinophilic pneumonitis in a previously healthy active-duty sailor. J Emerg Med. 2014; 47(1):15-17.
[89] Atkins G, Drescher F. Acute inhalational lung injury related to the use of electronic nicotine delivery systems (ENDS). Chest. 2015; 148(4 Supplement):83A.

cigarettes three months prior to her onset of symptoms. The patient rapidly improved with steroids and cessation of use of e-cigarettes.[90]

249.     Another early article recognizing a link between e-cigarettes and respiratory illness was Mantilla et al., who reported a case of a 27-year-old otherwise healthy man who was admitted to the hospital with dyspnea, cough, fever, and hemoptysis after increasing use of e-cigarettes for seven months prior to presentation, initiated in an effort to decrease his combustible tobacco dependence. Chest imaging revealed "diffuse, military nodular pattern" with "innumerable pulmonary nodules." The patient worsened and required intubation and mechanical ventilator support in spite of absence of any notable findings on microorganism workup, "making infectious etiology for his pneumonia very unlikely." Lung biopsy demonstrated bronchiolitis obliterans organizing pneumonia, which was treated with methylprednisolone, leading to rapid recovery.[91]

250.     JASON GLUCH was hospitalized and diagnosed with BOOP in July of 2019 after only 7 months of JUUL use.

251.     JASON GLUCH relied to his detriment on JUUL's representations that the product was safe, not harmful, and fun.

252.     JUUL never warned JASON GLUCH that JUUL was addictive, dangerous, was severely addictive, or could cause BOOP.

253.     Had JASON GLUCH known that JUUL was addictive or increased his risk for experiencing these side effects, he never would have tried it. JASON GLUCH feels as though he was lied to by Defendant JUUL.

254.     JUUL never disclosed to JASON GLUCH that it had manipulated the nicotine in JUUL to deliver massive doses of nicotine that could addict him quickly, spike his blood

---

[90] Modi S, Sangani R, Alhajhusain A. Acute lipoid pneumonia secondary to e-cigarettes use: An unlikely replacement for cigarettes. Chest. 2015: 148(4 Supplement):382A.
[91] Mantilla RD, Darnell RT, Sofi U. Vapor lung: Bronchiolitis obliterans organizing pneumonia (boop) in patient with e-cigarette use. 2016.

pressure, could cause cardiovascular injuries or mood disorders, could make breathing difficult, could cause BOOP, and affect the chemical balance in his brain.

255.    JUUL never instructed JASON GLUCH that the product was unsafe for him, nor how much JUUL was safe to consume.

256.    Had JASON GLUCH known that JUUL was not safe, was addictive, dangerous, could cause mood disorders, BOOP, cardiovascular injuries, make breathing more difficult, could permanently alter his brain and impair his mood and mind, that JUUL had manipulated nicotine to maximize addiction, or that each JUULpod delivered substantially more nicotine than a pack of cigarettes, or could cause BOOP he would not have used or continued to use JUUL.

257.    JASON GLUCH did not have any physical or mental health concerns until he began JUULing.

258.    As a result of Defendants' conduct, Plaintiff was harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette as described herein. Such harm includes respiratory arrest, Bronchial Obliterans Obstructive Pneumonia, severe sepsis, addiction cravings, and significant exposure to toxic substances, which may cause or contribute to additional disease.

259.    As a result of his injuries caused by JUUL, JASON GLUCH has incurred pain, suffering, permanently damaged lungs, emotional distress and significant medical expenses.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Design Defect - Consumer Expectations Test

260.    Plaintiff incorporates the above and below allegations by reference.

261.    At all relevant times, JUUL Labs, in concert and aided by Altria, Pax Labs, Inc., Phillip Morris USA  and Does 1 through 3, manufactured, distributed, and/or sold the JUUL Devices and Pods ("JUUL Products") that Plaintiff consumed.

262.    JUUL Products were defective in design in that they did not perform as safely as an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way.

263.    JUUL Products did not meet the consumer expectation of Plaintiff in that its dangers were unknowable and unacceptable to the average or ordinary consumer, including the Plaintiff.

264.    Defendants had constructive notice or knowledge and knew, or in the exercise of reasonable care should have known, that its JUUL Products were dangerous, had risks, and were defective in design, including because delivering high doses of nicotine to a young person could cause addiction to nicotine, permanently alter the structure of the developing brain, significantly increase blood pressure, and repeatedly expose users to toxic chemicals, resulting in permanent, life-altering injuries.

265.    As a result of Defendants' conduct, Plaintiff was harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette as described herein. Such harm includes respiratory arrest, Bronchial Obliterans Obstructive Pneumonia, severe sepsis, addiction cravings, and significant exposure to toxic substances, which may cause or contribute to  additional disease

266.    The defect(s) in JUUL Products was a substantial factor in causing Plaintiff's harms.

### SECOND CAUSE OF ACTION
### Design Defect - Risk-Utility Test

267.    Plaintiff incorporates the above and below allegations by reference.

268.    At all relevant times, Defendants manufactured, distributed, and/or sold the JUUL Products that Plaintiff consumed.

269.    The benefits of JUUL Products' design are not outweighed by their risks, considering the gravity of the potential harm resulting from the use of the products, the likelihood that the harm would occur, the feasibility and cost of an alternative safer design at the

time of manufacture, and the disadvantages of an alternative design.  Instead, as described herein, Defendants made their products available in youth-friendly colors and flavors. Defendants also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability, and increased the level of nicotine that is absorbed by users, making them even more addictive and dangerous.  There were and are alternative designs available to JUUL.   Defendants could have significantly lowered the nicotine content, while still delivering sufficient levels to cigarette smokers, to reduce the risks from high exposure to nicotine and repeated exposures to the toxic chemicals in JUUL.

270.    Defendants had constructive notice or knowledge and knew, or in the exercise of reasonable care should have known, that its Products were dangerous, had risks, and were defective in design, including because delivering high doses of nicotine to a young person could cause addiction to nicotine, significantly increase blood pressure, repeatedly expose users to toxic chemicals, and cause BOOP, respiratory failure, other lung injuries and  cardiovascular injuries resulting in permanent, life-altering damage.

271.    The JUUL products fail the risk-utility test and are defective because a reasonable person such as Plaintiff would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. In short the utility of using JUUL as an alternative to smoking was far outweighed by the injuries caused by JUUL which was promoted as an innocuous and thus safer product.

272.    As a result of Defendants' conduct, Plaintiff was harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette as described herein. Such harm includes respiratory arrest, Bronchial Obliterans Obstructive Pneumonia, severe sepsis, addiction cravings, and significant exposure to toxic substances, which may cause or contribute to additional disease

273.    The defect(s) in JUUL's Products was a substantial factor in causing Plaintiff's harms.

## THIRD CAUSE OF ACTION
### Strict Products Liability - Failure to Warn

274.    Plaintiff incorporates the above and below allegations by reference.

275.    At all relevant times, Defendants manufactured, distributed, and/or sold the JUUL Products that Plaintiff consumed.

276.    The JUUL Products that Plaintiff consumed had potential risks that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of manufacture, distribution, or sale.

277.    The potential risks presented a substantial danger when the JUUL Products were used or misused in an intended or reasonably foreseeable way.

278.    The ordinary consumer of JUUL Products would not have recognized the potential for risks.

279.    JUUL Products were defective and unreasonably dangerous when they left JUUL's possession because they did not contain adequate warnings, including warnings that the products, may cause strokes, BOOP, respiratory distress, pneumonia, heart attacks and other cardiovascular injuries.  Instead, as described herein, Defendants J made their products available in youth-friendly colors and flavors. Defendant also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability, and increased the level of nicotine that is absorbed by users, making them even more addictive and dangerous.

280.    JUUL Products were defective and unreasonably dangerous when they left JUUL's possession because they lacked sufficient instructions, including instructions regarding how many pods are safe to consume in a day, which and when  medical symptom warranted medical care, and the life threatening risks of the product.

281.    Defendants had constructive notice or knowledge and knew, or in the exercise of reasonable care should have known, that its Products were dangerous, had risks, and were defective without adequate warnings or instructions, including BOOP, respiratory distress, pneumonia and cardiovascular issues resulting in permanent, life-altering injuries.

282.     Defendants failed to adequately warn or instruct concerning the potential risks of the JUUL Products.

283.     As a result of Defendants' conduct, Plaintiff was harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette as described herein. Such harm includes respiratory arrest, Bronchial Obliterans Obstructive Pneumonia, severe sepsis, addiction cravings, and significant exposure to toxic substances, which may cause or contribute to  additional disease

284.     The lack of sufficient instructions and warnings was a substantial factor in causing Plaintiff's harms.

## FOURTH CAUSE OF ACITON
### Negligence and/or Gross Negligence

285.     Plaintiff incorporates the above and below allegations by reference.

286.     Defendants designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff.

287.     JUUL's Products were the types of products that could endanger others if negligently made or promoted.  Defendants knew the risks that young people would be attracted to their electronic cigarette devices and JUULpods.

288.     Defendants were negligent in designing, manufacturing, supplying, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, and/or labeling JUUL's Products.

289.     As a powerfully addictive and dangerous nicotine-delivery device, Defendants knew or should have known that JUUL Products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold and supplied properly, without defects and with due care to avoid needlessly causing harm.

Defendants knew or should have known that its JUUL Products could cause serious risk of harm, particularly to young persons like Plaintiff.

290.    Defendants were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

291.    The negligence and extreme carelessness of Defendants includes, but is not limited to, the following:

a.      Failure to perform adequate testing of the JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, respiratory, pulmonary and immune systems, and other related medical conditions, as well as its effect on mental health;

b.      Failure to take reasonable care in the design of JUUL's Products;

c.      Failure to use reasonable care in the production of JUUL's Products;

d.      Failure to use reasonable care in the manufacture of JUUL's Products;

e.      Failure to use reasonable care in the assembly of JUUL's Products;

f.      Failure to use reasonable care in supplying JUUL's Products;

g.      Failure to use reasonable care in advertising, promoting, and marketing JUUL's Products;

h.      Use of flavors and design to appeal to young people, in that the products smell good, look cool and are easy to conceal from parents and teachers;

i.      Use of design that maximizes nicotine delivery while minimizing "harshness", thereby easily creating and sustaining addiction;

j.      Failure to reasonably and properly test and properly analyze the testing of JUUL's Products under reasonably foreseeable circumstances;

k.      Failure to warn its customers about the dangers associated with use of JUUL's Products, in that it was unsafe for anyone, significantly increases blood pressure, causes vascular and pulmonary damage, carries risks of stroke, heart attacks, and pulmonary and

cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition.

l.      Failure to provide any instructions regarding a safe amount of JUUL pods to consume in a day.

m.      Failure to warn customers that JUUL had not adequately tested or researched JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

n.      Failure to utilize proper materials and components in the design of JUUL's Products to ensure they would not deliver unsafe doses of nicotine;

o.      Failure to use due care under the circumstances;

p.      Failure to take necessary steps to modify JUUL's Products to avoid delivering high doses of nicotine to young people and repeatedly exposing them to toxic chemicals;

q.      Failure to recall JUUL's Products; and

r.      Failure to inspect JUUL's Products for them to operate properly and avoid delivering unsafe levels of nicotine to young persons.

292.    Defendants' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful person would do in the same situation to prevent foreseeable harm to young persons, like Plaintiff.

293.    Defendants acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff.  Defendants' acts and omissions had a great probability of causing significant harm and in fact resulted in such harm.

294.    Based on their strategic and intentional marketing history, Defendants reasonably should have foreseen that young people would try JUUL products and quickly become addicted to JUUL products, resulting in teenagers and young adults developing lifelong addictions. After placing unnecessarily massive amounts of nicotine into their products, Defendants reasonably

should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

295.    As a result of Defendants' conduct, Plaintiff was harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette as described herein. Such harm includes respiratory arrest, Bronchial Obliterans Obstructive Pneumonia, severe sepsis, addiction cravings, and significant exposure to toxic substances, which may cause or contribute to additional disease.

296.    Defendants' negligence and/or gross negligence were a substantial factor in causing Plaintiff's harms.

## FIFTH CAUSE OF ACTION
### Negligent Failure to Recall

297.    Plaintiff incorporates the above and below allegations by reference.

298.    JUUL acted negligently by failing to recall the JUUL Products prior to Plaintiff's development of BOOP.

299.    JUUL, in concert with the other Defendants designed, manufactured, assembled, produced, distributed, maintained and/or sold the JUUL Products.

300.    JUUL knew or reasonably should have known that, when used as intended, the JUUL Products presented or were likely to present a danger to users, including young persons like Plaintiff.  JUUL knew or reasonably should have known that its Products were delivered excessive doses of nicotine, significantly increase blood pressure, cause vascular damage, cause addiction, cause BOOP, permanent brain changes, mood disorders, strokes, heart attacks, and other cardiovascular injuries.

301.    After JUUL Products were placed on the market in 2015, and before July 8, 2017, JUUL knew or reasonably should have known its Products were unsafe, that its Products delivered excessive doses of nicotine, significantly increase blood pressure, cause vascular damage, cause addiction, permanent brain changes, mood disorders, strokes, heart attacks, and

other cardiovascular injuries. Nevertheless, at no point during this time period did JUUL recall, repair, or warn of the danger posed by Products.

302. A reasonable designer, manufacturer, distributor, or seller facing the same or similar circumstances as JUUL in the exercise of reasonable care, would have recalled JUUL Products to ensure people including Plaintiff were not harmed.

303. JUUL's failure to timely recall its Products was a substantial factor in causing harm to Plaintiff. Had JUUL recalled its Products when it knew or should have known of the risks to young people like Plaintiff, he would not have used it, and he would not been injured.

**SIXTH CAUSE OF ACTION**
**Fraudulent Concealment**

304. Plaintiff incorporates the above and below allegations by reference.

305. Defendants had a duty to disclose material facts about JUUL to Plaintiff, as:

a. Defendants disclosed some facts to Plaintiff about the nature and safety of its products but intentionally failed to disclose other facts, making the disclosures it did make misleading or deceptive; and

b. Defendants intentionally failed to disclose certain facts about the nature and safety of JUUL products that were known only to Defendants and that Defendants knew Plaintiff could not have known or reasonably discovered.

306. At all times relevant, Defendants fraudulently and deceptively sold or partnered to sell JUUL products to Plaintiff as safe or not harmful, when Defendants knew it to be untrue.

307. Defendants fraudulently and deceptively downplayed or minimized any risk associated with e-cigarettes generally. At all relevant times, Defendant JUUL represented its products on its website as a "smarter" choice. Defendant JUUL pitched investors by claiming that the product was not harmful, and therefore any concern about addiction was irrelevant. Defendants and/or others worked together to pitch news stories or other media content designed to downplay the risks of e-cigarettes, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion

among the public, to initiate new users, to keep customers buying JUUL products, and to avoid regulation or legislative efforts to control sales.

308.    Defendants failed to disclose to Plaintiff that the JUUL is powerfully addictive, significantly increases blood pressure, and other adverse health effects.

309.    Defendants failed to disclose that they had not adequately researched or tested JUUL to assess its safety before placing it on the market and promoting it to young people.

310.    At all times relevant to Plaintiff, Defendants failed to disclose that JUUL was addictive and that its design inherently demanded dependency.

311.    Defendants also failed to disclose to Plaintiff that the JUUL nicotine salts purchased were highly addictive in nature, making it extremely difficult for one to cease purchasing JUULpod refills.

312.    Defendants further failed to disclose to Plaintiff that JUUL is designed to create and sustain an addiction to nicotine. Defendants also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendants did so without notifying Plaintiff.  Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes.

313.    Defendants fraudulently misrepresented to users the amount of nicotine consumed by using JUUL. As previously explained, Defendant JUUL claims that one JUULPod is "approximately equivalent to about 1 pack of cigarettes," but that is false and misleading. The amount of nicotine consumed from one JUULPod is actually equivalent to the amount of nicotine consumed through at least two packs of traditional cigarettes.

314.    Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase or consume JUUL ENDS or Pods.

315.    Plaintiff did not know of the facts that Defendants concealed.

316.    Defendants intended to deceive Plaintiff and the public by concealing these facts.

317.    Defendants had a duty to accurately provide this information to Plaintiff.  In not so informing Plaintiff, Defendants breached their duty.  Defendants also gained financially from, and as a result of their breach.

318.    Defendants had ample opportunities to disclose these facts to Plaintiff, through packaging, advertising, retail outlets, on its website, and on social media. Defendants concealed material information at all relevant times, through today. Defendants have yet to disclose the truth about JUUL products.

319.    Plaintiff relied to his detriment on Defendants' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from them regarding the safety of JUUL, and not intentionally deceived by Defendants, he would not have purchased or used JUUL products.

320.    Defendants' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: significant exposure to toxic substances, which may cause or contribute to causing disease including BOOP.

321.    Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### SEVENTH CAUSE OF ACTION
### Conspiracy to Commit Fraudulent Concealment

322.    Plaintiff incorporates the above and below allegations by reference.

323.    During all relevant times, including before Plaintiff consumed JUUL, Defendant JUUL was part of a conspiracy with tobacco and e-cigarette industry players, Altria, Phillip Morris USA, Inc., Pax Labs Inc. and Does 7 – 10, to fraudulently conceal, misrepresent, and downplay the risks of e-cigarettes to boost profits at the expense of public health.  Defendants and  Does 7 through 10, engaged consultants, pundits, academics, lobbyists, media personalities,

reporters, researchers and other influencers to tout the safety of e-cigarettes, and benefits of nicotine, while minimizing or downplaying the dangers. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers buying JUUL products, and to avoid regulation or legislative efforts to control sales.

324.    JUUL was aware that others in the e-cigarette and tobacco industry, Altria, Phillip Morris Inc. and Does 7 through 10, planned to engage in a campaign of doubt to mislead, downplay, and deflect concerns about the risks of e-cigarettes and nicotine, and to fraudulently conceal material information about the safety of these products and compounds.

325.    JUUL agreed with others in the e-cigarette and tobacco industry, Phillip Morris Inc. Altria and Does 7 through 10, and intended that the conspiracy to commit fraudulent concealment be committed.

326.    JUUL well-understood and continues to understand that by working in concert with other e-cigarette manufacturers and the tobacco industry, it can more effectively mislead and fraudulently conceal material facts from the public, including Plaintiff, regarding risks of its products, as described herein.

327.    JUUL's participation in this conspiracy was a substantial factor in causing Plaintiff's harms as alleged herein.

328.    Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## EIGHTH CAUSE OF ACTION
### Intentional Misrepresentation

329.    Plaintiff incorporates the above and below allegations by reference.

330.    At all times relevant, Defendants represented to Plaintiff via the media, advertising, website, social media, packaging, and promotions that:

      a.     JUUL products were safe or not harmful; and

      b.     That one JUULPod is "approximately equivalent to about 1 pack of cigarettes"

331.    These representations were false.  The amount of nicotine consumed from one JUULPod is actually equivalent to the amount of nicotine consumed through at least two packs of traditional cigarettes.

332.    Defendants knew these representations were false, or made them recklessly without regard for their truth.  For example, JUUL claims that it did not study the safety of its products, acknowledging that it had a vested interest, and instead left it to others to analyze their risks.

333.    Defendants intended for Plaintiff to rely on these representations.

334.    Each of these misrepresentations were material at the time they were made. In particular, each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase or consume JUUL ENDS or Pods.

335.    Defendants have yet to disclose correct these misrepresentations about JUUL products.

336.    Plaintiff reasonably relied on these representations and was harmed as described herein.  Plaintiff's reliance on Defendants' representations was a substantial factor in causing his harms, including becoming powerfully addicted to JUUL. Had Defendants told Plaintiff the truth about the safety and composition of JUUL's products, he would not have purchased them.

337.    As a result of JUUL's conduct, Plaintiff was harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette as described herein. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease including BOOP.

338.     Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## NINTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress (against Defendants JUUL, Altria and Does 1-100)

339.     Plaintiff incorporates the above and below allegations by reference.

340.     Defendants' conduct herein, preying on youth and poisoning kids for profit, is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. Defendants' conduct is atrocious and utterly intolerable. Defendants' outrageous conduct caused and/or substantially contributed to Plaintiff's injuries alleged herein.

341.     Defendants' egregious conduct toward Plaintiff was both intentional and reckless. Defendants' conduct of intentionally addicting teenagers to nicotine to create lifelong customers was directed primarily at young people like Plaintiff, through their manipulation of advertisements, social media, warnings, and even use of social media influencers indirectly to target America's youth.

342.     Defendant also acted with reckless disregard when they knew that JUUL products were powerfully addictive, contained more nicotine than necessary, and carried serious physical, mental and emotional health risks, especially when used by young people, yet they marketed the products to young people with reckless disregard of young consumers like Plaintiff and with reckless disregard of the probability that their conduct would cause severe emotional distress to Plaintiff.

343.     Plaintiff JASON GLUCH has suffered severe emotional distress and physical injuries as a result of Defendants' outrageous, intentional and reckless conduct.

**TENTH CAUSE OF ACTION**
**Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**(against Defendants JUUL, Altria and Does 26 through 100)**

344.    Plaintiff incorporates the above and below allegations by reference.

345.    Plaintiff is informed and believes, and thereon alleges, that Defendants, by the acts and misconduct alleged, violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq. ("UTPCPL").

346.    The UTPCPL applies to Defendants' actions and conduct described herein because it extends to transactions which are intended to result, of which have resulted, in the sale of goods to consumers.

347.    Plaintiff was a "consumer" within the meaning of the UTPCPL.

348.    Plaintiff purchased primarily for personal use the JUUL products used on by him and, thereby, suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

349.    On information and belief, said purchase occurred in the State of Pennsylvania.

350.    Defendants have violated and continue to violate the UTPCPL in representing that goods have characteristics and benefits which they do not have.

351.    Defendants engaged in knowingly wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiff for the JUUL products used by him, that would not have been paid had Defendants not engaged in such unfair and deceptive conduct.

352.    Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

      a.      making untrue, misleading, and/or deceptive assertions, representations or statements of fact that goods or services have characteristics, components, uses benefits or quantities that they do not have;

      b.      advertising goods or services with the intent not to sell them as advertised;

      c.      engaging in fraudulent or deceptive conduct that creates a likelihood of

353.     The untrue, misleading, and/or deceptive assertions, representations or statement
of fact regarding JUUL products were made by Defendants to the public in promotional
materials.

354.     Under the UTPCPL, Defendants are the suppliers, manufacturers, advertisers, and
sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and
unconscionable consumer sales practices.

355.     Defendants violated the statutes that were enacted to protect consumers against
unfair, deceptive, and misleading business practices and false advertising, by knowingly and
falsely representing that their JUUL products were fit to be used for the purpose for which they
were intended, when in fact said devices were defective and dangerous, and by other acts alleged
herein.

356.     The actions and omissions of Defendants alleged herein are uncured or incurable
deceptive acts under the statutes enacted in the states to protect consumers against unfair,
deceptive, fraudulent and unconscionable trade and business practices and false advertising.

357.     The acts of untrue and misleading statements by Defendants described
hereinabove present a continuing threat to members of the public and individual consumers in
that the acts alleged herein are continuous and ongoing, and the public and individual consumers
will continue to suffer harm.

358.     Defendants had actual knowledge of the defective and dangerous condition of the
products and failed to take any action to cure such defective and dangerous conditions.

359.     Reasonable consumers, including Plaintiff, were injured by Defendants' unfair
and deceptive acts.

360.     As a direct and proximate result of the false representations described herein,
Plaintiff were injured as described above.

361.     By reason of the foregoing and, as a direct and proximate result of Defendants'
violations of UTPCPL, Plaintiff have sustained economic losses, mental anguish, and other

damages, and are entitled to statutory and compensatory damages in an amount to be proven at trial.

## VII.   **EQUITABLE TOLLING OF STATUTES OF LIMITATIONS**

362.   Plaintiff hereby incorporates by reference all other paragraphs of this Complaint.

363.   Plaintiff has suffered permanent and life-altering injuries as a result of Defendants' conduct.

364.   Plaintiff filed this lawsuit within the applicable limitations period of first suspecting that the JUUL Products were the cause of any appreciable harm sustained by Plaintiff, within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries. Plaintiff could not, by the exercise of reasonable diligence, have discovered any wrongdoing and could not have discovered the causes of the injuries at an earlier time because the injuries occurred without initial perceptible trauma or harm and, when the injuries were discovered, the causes were not immediately known.  Plaintiff did not suspect, nor did he have reason to suspect, that wrongdoing had caused the injuries until recently.  Plaintiff filed the original action within two years of discovering the causes of action and identities of Defendants.

365.   Plaintiff had no knowledge of the defects in the JUUL Products or of the wrongful conduct of Defendants as set forth herein, nor did Plaintiff have access to information regarding other injuries and complaints in the possession of Defendants.  Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public that the JUUL Products are safe, and Defendants fraudulently concealed information to allow Plaintiff to discover a potential cause of action sooner.

366.   Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with consuming JUUL e-cigarettes and JUULPods.

367.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know, or could not have reasonably learned through reasonable diligence, that Plaintiff has been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

368.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of the JUUL e-cigarette and other JUUL products. Defendants were under a duty to disclose the true character, quality and nature of the JUUL products because this was non-public information over which the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to Plaintiff.

369.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable JUUL products, notwithstanding the known or reasonably known risks. Plaintiff could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and was forced to rely on Defendants' representations.

370.    In representations to the Plaintiff and the public in general, Defendants also fraudulently concealed and intentionally omitted the following material information:

a.    that JUUL products delivered excessive doses of nicotine, significantly increase blood pressure, cause addiction, permanent brain changes, mood disorders, strokes, heart attacks, and other cardiovascular injuries, and

b.    that the JUUL products were defectively and negligently designed and had defective, inadequate, and insufficient warnings and instructions.

371.    Defendants were under a duty to disclose to Plaintiff, and the public in general, the defective nature of the JUUL Products.

372.    Defendants made the misrepresentations and actively concealed information concerning the unsafe, dangerous, and harmful nature of the JUUL products with the intention

and specific desire to induce the consumers, including Plaintiff, to rely on such misrepresentations in selecting, purchasing and using the JUUL Products.

373.    Defendants made these misrepresentations and actively concealed information concerning the unsafe, dangerous, and harmful nature of the JUUL Products in the labeling, advertising, promotional material or other marketing efforts.

374.    These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

375.    The misrepresentations and active concealments by Defendants were perpetuated directly and indirectly by Defendants, its sales representatives, employees, distributors, agents, marketers and those with whom it worked in concert to design, develop, market and distribute JUUL products.

376.    At the time the misrepresentations were made, Plaintiff did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the JUUL Products. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

377.    Defendants knew that Plaintiff, and the public in general, had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the JUUL Products, as set forth herein.

378.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the JUUL Products, Plaintiff would not have purchased, used, or relied on Defendants' JUUL Products.

379.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, including Plaintiff.

380.    The information distributed to the public and Plaintiff by Defendants included, but was not limited to advertising campaigns, television commercials, print advertisements,

billboards, social media posts, the use of social media personalities as promoters, and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the JUUL Products.

381.    Defendants intentionally made material misrepresentations to the public, including Plaintiff, regarding the safety of the JUUL Products specifically that the JUUL Products did not have dangerous and/or serious adverse health safety concerns, and that the JUUL Products were safe for consumption by young adults.

382.    Defendants' intent and purpose in making these misrepresentations was to deceive the Plaintiff; to gain the confidence of the public and Plaintiff, to falsely assure them of the quality and fitness for use of the JUUL Products; induce Plaintiff and the public to use the JUUL Products; and to avoid litigation and liability.

383.    Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the JUUL Products to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and/or not as safe as other alternatives.

384.    The misrepresentations and active concealment by Defendants constitute a continuing tort. Indeed, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the JUUL Products.

385.    As a result of the Defendants' advertising and marketing efforts, misrepresentations and omissions, the JUUL Products are and continue to be pervasively manufactured and used in California and Pennsylvania and throughout the United States.

386.    The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of Plaintiff and other users of the JUUL Products and for the primary purpose of increasing Defendant's profits from the sale and distribution of the JUUL Products. Defendants' outrageous and unconscionable conduct warrants an award of exemplary

and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

387.    Prior to the manufacturing, sale and distribution of the JUUL Products, Defendants, and each of them, knew that the JUUL Products were dangerous and unsafe when used as intended as previously alleged herein and knew that those who consumed the JUUL Products would experience and did experience severe injuries, such as those experienced by Plaintiff. Further, Defendants and each of them through its officers, directors, managers, and agents, had knowledge that the JUUL Products presented a substantial and unreasonable risk of harm to the public, including Plaintiff and, as such, consumers of the JUUL Products were unreasonably subjected to risk of injury.

388.    Despite such knowledge, Defendants, and each of them, acting through its officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly and deliberately failed to remedy the known defects in the JUUL Products and failed to warn the public, including the Plaintiff, of the extreme risk of injury inherent in the JUUL Products. Defendants and its individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the JUUL Products knowing that the public, including Plaintiff, would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

389.    Defendants' conduct was willful, wanton, despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for safety, entitling Plaintiff to exemplary damages.

390.    Plaintiff has reviewed the potential legal claims and causes of action against the Defendants and intentionally chooses only to pursue claims based on state law.  Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question.  Plaintiff chooses to only pursue claims based on state law and are not making any claims that raise federal questions.

## VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

1.      Award Plaintiff compensatory and  punitive exemplary damages in an amount to be determined at trial, and also including, but not limited to:

      a.      General Damages;

      b.      Special Damages, including all expenses, including incidental past and future expenses, including medical expenses, and loss of earnings and earning capacity;

2.      Award prejudgment interest as permitted by law;

3.      Enter other appropriate equitable relief;

4.      Award reasonable attorneys' fees and costs, as provided for by law; and

5.      Grant such other and further relief as the Court deems just and proper.

## IX.   **JURY TRIAL DEMAND**

Plaintiff demands trial by jury.


Dated this 16th day of October, 2019

By: _____

ELLEN RELKIN (PA Bar. #314992)
**WEITZ & LUXENBERG, P.C.**
*Attorneys for Plaintiff*
700 Broadway
New York, NY 10003
Telephone (212) 558-5715